CASE No. 1110.

PELZER, RODGERS & CO. v. CAMPBELL & CO.

1. A creditor agreed to give his debtor, a partnership firm, further indulgence, if notes were given him for the amount due, signed by the firm and by C., the mother of one of the partners. The notes were signed in the partnership name, with a seal added, and were then taken to C. by her son, and afterwards delivered to the creditor with her signature and seal. *Held*,

that the notes were supported by a sufficient consideration and binding upon C., and that parol evidence was inadmissible to show the understanding and intention of C. at the time of execution, or that she was ignorant of the indulgence given.

2. Even if the seal of the partnership was affixed to the notes, which were given for an existing partnership debt, without the authority of one of the partners, C. would not thereby be released from her obligation.

3. A married woman signed the notes of her son as surety, without any advantage to herself or her estate. *Held*, that she had legal capacity to bind herself, and was liable for the payment of the debt.

4. An act of the legislature may not be lightly declared unconstitutional; every part of the state constitution should, if possible, be so construed as to allow full force to Section 1, Article II., which vests plenary legislative power in the general assembly.

5. The general objects of a written constitution are to lay down fundamental principles and to limit the powers of government, but not to legislate on mere details.

6. While power to legislate upon a subject may be prohibited by a constitutional provision simply affirmative, as where such provision would be frustrated by legislation, yet the doctrine of exhaustive grant is not favored; and as to matters upon which the legislature had before been accustomed to act, its right to legislate further will not be taken away by implication, unless such implication is necessary.

7. This case distinguished from *Duncan* v. *Barnett*, 11 *S. C.* 333.

8. There is nothing in the constitution of 1868 which prevents the legislature from giving to married women rights and powers in addition to those conferred by that instrument; and, therefore, the provision in the act of 1870 (*Gen. Stat., ch. C.,* ? 3,) authorizing a married woman to contract and be contracted with, in the same manner as if she were unmarried, is not unconstitutional.

9. Under this provision of the law, the personal contracts of a married woman are binding upon her, and upon them she may be sued to judgment.

Before PRESSLEY, J., Anderson, September, 1879.

Action commenced in 1879 by the plaintiffs against A. R. Campbell & Co. and Mary M. Campbell, upon the three notes set out in full in the opinion of this court. W. N. Mitchell was not served and A. R. Campbell put in no appearance. The three notes were given for a debt of A. R. Campbell & Co. to Pelzer, Rodgers & Co., then past due.

A. R. Campbell testified that his mother was not present when he settled with the agent of plaintiffs, and she knew nothing of

the extension of time given to A. R. Campbell & Co. by the plaintiffs; that she was not a partner and was not owing the firm anything, and had no interest in it; that when he offered his mother as security plaintiffs' agent left, and he then went to see his mother and told her that he expected it would be necessary for her to sign a note with A. R. Campbell & Co., and her reply was, "Well, you can sign my name." Then the following questions were put to witness: (1.) "Who signed this note?" *Ans.* "I did it for my mother." [Question objected to by counsel and was ruled out.] (2.) "What authority did you have?" (3.) "Did she authorize you to sign her name as surety for yourself, individually, or for the firm of A. R. Campbell & Co.?" (4.) "Was she aware that any extension of time was granted to A. R. Campbell & Co. by the plaintiffs, on the consideration that she would sign the notes?" All of which questions were ruled out and exceptions noted.

It was not pretended that the plaintiffs had any knowledge of the matters between A. R. Campbell and his mother, in regard to his signature to the notes for her, which defendants offer to prove by A. R. Campbell, or that he signed them for her.

Other facts are stated in the opinion.

Mr. *J. L. Orr,* for appellants, cited *Wells on Marr. Wom.,* §§ 345, 352, 357, 423, 455, 473, 530–2; *Pom. on Rem.,* § 322, *et seq.; Story on Part.,* § 117; *Dud.* 362; 2 *McM.* 349; 46 *N. Y.* 175; 3 *Paige* 648; 3 *Minn.* 206; 5 *Wait's Act. & Def.* 231; 1 *Kent* 448; 1 *Cranch* 137; 10 *S. C.* 348; 11 *S. C.* 333; 7 *S. C.* 102; *Dwar. Stat.* 605; 3 *Wait's Act. & Def.* 676; 1 *Wait's Dig.* 830, §§ 91, 94, 832, §§ 118–120; 6 *L. & Eq. Rep.* 364; 47 *Ind.* 302; 38 *Penna. St.* 146; 42 *Id.* 325; 65 *Barb.* 159; 36 *Ind.* 414; 51 *Miss.* 599; 43 *Miss.* 72; 4 *Allen* 440; 25 *Wend.* 658; 15 *Gray* 328; 23 *N. J. Eq.* 526; 24 *Mich.* 199; 63 *Ill.* 60; 23 *Iowa* 397.

Mr. *Joseph N. Brown,* contra.

November 16th, 1881. The opinion of the court was delivered by

McGOWAN, A. J.   This was an action on three notes, under seal, as follows :

$735.88.                          BELTON, S. C., May 17, 1878.

On the fifteenth of November next, we, or either of us, promise to pay to the order of Pelzer, Rodgers & Co., without off-set, seven hundred and thirty-five 88-100 dollars, value received. Witness our hands and seals.

A. R. CAMPBELL & Co.   [L. S.]
MARY M. CAMPBELL.      [L. S.]

$213.44.                          BELTON, S. C., May 17, 1878.

On the first of December next, we, or either of us, promise to pay to the order of Pelzer, Rodgers & Co., without off-set, two hundred and thirteen 44-100 dollars, value received. Witness our hands and seals.

A. R. CAMPBELL & Co.   [L. S.]
MARY M. CAMPBELL.      [L. S.]

$746.21.                          BELTON, S. C., May 17, 1878.

On the first of February next, we, or either of us, promise to pay to the order of Pelzer, Rodgers & Co., without off-set, seven hundred and forty-six 21-100 dollars, value received. Witness our hands and seals.

A. R. CAMPBELL & Co.   [L. S.]
MARY M. CAMPBELL.      [L. S.]

A. R. Campbell and W. N. Mitchell, doing business at Belton, Anderson county, under the name and style of A. R. Campbell & Co., became indebted to Pelzer, Rodgers & Co., who agreed to give indulgence for the time indicated in the notes if the mother of A. R. Campbell, one of the firm, would sign the notes as surety.   Campbell took the notes and returned them, signed by Mrs. Campbell.   The plaintiffs accepted them and gave the indulgence.

Mrs. Campbell was not connected with the firm of A. R. Campbell & Co., and signed the notes only to enable them to get indulgence on the debt.   The complaint stated that Mrs.

Campbell was a married woman and owned in her own right a farm in Anderson county, worth $2000. The principal defence was that Mrs. Campbell, being a married woman, had no legal capacity to make a personal contract upon which judgment could be recovered so as to bind her separate estate. The Circuit judge held that she had such capacity and was liable. The plaintiff had a verdict for the amount of the notes, and Mrs. Campbell appeals to this court upon 'the following exceptions :

" 1. Because his Honor erred in not dismissing the complaint on the demurrer; that it did not state facts sufficient to constitute a cause of action to charge the separate estate of defendant.

" 2. A. R. Campbell signed the sealed notes in the firm name, without special authority. He could not bind W. N. Mitchell, the other partner, and Mrs. Campbell being surety, she is not bound by the contract, being different from that she signed. And his Honor erred in ruling that a sealed note now stands on exactly the same ground with an unsealed note in every respect, and that both Mitchell and Mrs. Campbell were bound.

" 3. Because his Honor erred in ruling that if the constitutional clause defining the rights and powers of married women had been under the legislative department, the legislature could not have enlarged or narrowed its provisions, but being under the miscellaneous department they could do so.

" 4. Because his Honor erred in not making the following charge, as requested by defendant's counsel : *First.* ' As to separate estate of wife, the constitution declares that she can bequeath, devise or alienate it the same as if she were unmarried. The legislature cannot enlarge its provisions so as to allow a married woman to contract and be contracted with generally.' *Second.* ' The proof by plaintiffs being that the only consideration for signature of Mrs. Campbell was the extension of time to' A. R. Campbell & Co., she is not bound.' *Third.* ' That nothing appearing in the contracts showing an intention to charge the separate estate of defendant or to alienate it, and there being no proof of an intention to charge it, it cannot be made liable for the debts of A. R. Campbell & Co.' *Fourth.* ' That plaintiffs having failed to show any benefits or consideration accruing

to this defendant or her separate estate from them, she is not bound by said notes.'

"5. Because his Honor erred in holding that Mrs. Campbell was bound by the consideration of extension of time to A. R. Campbell & Co., when their own admissions show that Mrs. Campbell was not a party to any such agreement, and was not present when arrangements were made.

"6. Because this defendant is not bound by any agreement or consideration between A. R. Campbell & Co. and plaintiffs, of which she had no knowledge.

"7. Because this defendant having denied any consideration for her signing said note, before plaintiffs can make extension of time to A. R. Campbell & Co. sufficient consideration to bind her, they must show that she knew of that consideration before she signed the notes.

"8. Because his Honor erred in ruling that a married woman could bind her separate property as a surety to a contract wherein she was not interested.

"9. Because his Honor erred in holding that a married woman could bind her separate estate in a contract, where her separate estate derived no benefit therefrom, or where the contract itself expressed no intention to bind such estate.

"10. Because his Honor erred in ruling out the questions propounded to A. R. Campbell, a witness for the defence."

The *second, fifth, sixth, seventh* and *tenth exceptions* relate to alleged want of consideration for the signature of Mrs. Campbell to the notes in question, and to the exclusion of testimony as to whether her son had authority to sign for her, and whether, at the time, she knew of the extension of time given to A. R. Campbell & Co. It appears in the case, as admitted, that "the plaintiffs agreed to give A. R. Campbell & Co. the specified time in said notes if the defendant, Mrs. Mary M. Campbell, the mother of A. R. Campbell, would sign the said notes, *and they were returned signed by her and accepted by plaintiffs.*" After this admission, proof as to who signed for Mrs. Campbell, whether such person had authority to do so, or whether she knew of the consideration of indulgence given to A. R. Campbell & Co., was immaterial and irrelevant. A. R. Campbell knew the consider-

ation which was offered for the security, which, it was supposed, the name of his mother would afford. He procured her signature and got the consideration. Parol evidence was not admissible to explain the notes as to whether they were signed as surety for the firm or for A. R. Campbell, individually. The notes were the only evidence of the intention of Mrs. Campbell in signing them, and by them her responsibility must be tested. " There is no rule better settled than that evidence of contemporaneous parol declarations is inadmissible to vary the terms of a written agreement." *Wright* v. *Remington*, 12 *Vroom* 54.

Mrs. Campbell had no connection with the business of A. R. Campbell & Co. In order to secure indulgence for them, at the instance of her son, who was one of the firm, she signed the notes. Was that consideration enough to make her, in this connection, considered as a person *sui juris*, liable upon the notes ? We think it was. " An agreement on the part of the creditor to extend the time of payment to the principal for a definite time, is a sufficient consideration for the contract of suretyship or guaranty—the one agreement being a consideration for the other —and the delay usually operating both as a benefit to the principal and a detriment to the creditor." *Brandt on Suretyship*, § 8 ; *Thomas* v. *Croft*, 2 *Rich*. 115.

But these were sealed notes, and it is urged that A. R. Campbell could not legally sign them for A. R. Campbell & Co. ; that they are, in fact, not the notes of the other partner, Mitchell, and in consequence of this rule of law, of which she was ignorant, Mrs. Campbell, a mere surety, is released from liability. She signed the notes with A. R. Campbell & Co., and their tenor is : " We or either of us promise to pay," &c. When she signed she knew that they were sealed notes. There is no proof of fraud practiced upon her, or misrepresentations by the plaintiffs to induce her to sign, and even if there was a mistake in matter of law as to the liability of Mitchell upon the notes, that could not release her.

The question of Mitchell's liability has not been tried, and it may possibly be that he is not liable on the notes, but we suppose there is no doubt that he is still liable for the partnership debt for which the notes were given. The notes of A. R. Camp-

bell alone, although in the name of A. R. Campbell & Co., did not merge the firm debt so far at least as Mitchell was concerned, and he is still liable therefor. *Flemming, Ross & Co.* v. *Lawburn & Co., Dud.* 362; *Pierce* v. *Cameron et al.,* 7 *Rich.* 116; *Spear* v. *Gillet,* 1 *Dev. Eq.* 466; 4 *Dev.* 90, 459.

*All the other exceptions, in one form or another, make the question that Mrs. Campbell, being a married woman at the time she signed the notes, without advantage to herself or her estate, had not legal capacity to make such a contract, and, therefore, is not liable..*

The relation of husband and wife, whether we regard the responsibilities of the parties to each other, or to the community and its members, is the most important known to society; indeed, it is "the parent, not the child of society." The exact *status* which the wife should occupy has always been a most fruitful source of discussion, especially as to her capacity to hold, change and dispose of property in her own right as separate from that of her husband. From the very nature of the subject it is not without difficulty. Husband and wife are separate, natural persons, with different faculties, sentiments and desires, and yet their relation makes them the heads of one family, with common interests, common hopes and common purposes. The doctrines of the old common law upon the subject are familiar. To speak in general terms, husband and wife are a unity, or, as it was expressed by the great law-giver, "they twain shall be one flesh." The civil existence of the wife was merged in that of the husband, whose duty it was to support and govern the family, and to enable him to do so he was, with small exception, entitled to the property, the earnings and the obedience of his wife, whose disabilities were complete.

In modern times the position of woman in the community, and particularly the wife, in regard to her husband, is different from what it was ages ago. But it is matter of wonder to observe what confusion still prevails, and how far the subject still seems to be from final and satisfactory settlement. Most of the states of the Union originally adopted the old common law of the mother country, modified as it had been by the introduction of trusts and the peculiar doctrine of "the separate estate" of married women, created by act of the parties and administered

exclusively in courts of equity.   But later, as property in-
creased and the relations of a highly civilized society became
more complex, there was developed a tendency to escape from
what was regarded as the hard and unbending rules of the com-
mon law, and to bestow upon the wife a larger capacity to hold
property in her own right, and to dispose of it without regard to
the wishes of her husband.   There is no doubt of such general
tendency, but there never has been unanimity upon the subject.
A part of every community adhered to the old rule as best cal-
culated to promote harmony, prosperity and happiness, while
another part pressed forward in the direction of what was called
the civilized doctrine of emancipating the wife from the slavery
of the old law and re-endowing her with the faculties and rights
of a human being.

In this modern reform most if not all of the states joined, but
not with even pace.   Each made its own rules and regulations,
and the result was an entire want of uniformity, and great con-
fusion and perplexity in the principles applied to the vexed
question of "the separate estates" of married women.   In the
language of Mr. Bishop: "Since the confusion of tongues at the
Tower of Babel there has been nothing more noteworthy, in the
same line, than the discordant and ever-shifting utterances of the
judicial mind on the subject of the power of a married woman,
and her separate estate in the absence of specific provision in the
deed of settlement.   True, there has been sometimes a language,
which, though limited in its sphere, was tolerably plain, but no
sooner was the language in the way of being understood, when
lo! some conquering power of another sort came in, and all was
confusion once more."   1 *Bish. on Mar. Wom.*, § 847.

In this "sea of troubles" two currents of opinion were dimly
visible, one holding that a married woman, as to her separate
estate, was a *feme sole*, and, as such, entitled to exercise all rights
not taken away from her, and the other maintaining that as to
such property she was still under the disabilities of coverture and
entitled to exercise no rights except such as were expressly con-
ferred upon her by the deed creating the estate.   The courts in
this state always adhered to the latter opinion.   *Reid* v. *Lamar*,
1 *Strob. Eq.* 27.   Around and between these two great leading

currents there was every conceivable variety of opinion, expressed in qualifications, modifications, exceptions, explanations, &c. These intricacies and contradictions in the old law of the "separate estate," as created *inter partes*, were so great and bewildering that in considering questions growing out of our late laws, which create what is known as "*the statutory separate estate*," little assistance can be derived from the multitudinous decisions of other states upon the subject; none, indeed, except from the states which have laws similar to our own. On the contrary, the most laborious effort to harmonize and utilize these decisions will be found to be utterly hopeless, and, indeed, to make "confusion worse confounded."

For a series of years before the adoption of the constitution, efforts were made in the legislature of this state to pass a law making the property of the wife her separate estate, not liable to the debts of her husband, without the necessity of a deed to that effect or the appointment of a trustee. In 1868 the constitution was adopted, of which Article XIV., Section 8, declares as follows: "The real and personal property of a woman, held at the time of her marriage, or that which she may thereafter acquire, either by gift, grant, inheritance, devise or otherwise, shall not be subject to levy and sale for her husband's debts, but shall be held as her separate property, and may be bequeathed, devised or alienated by her the same as if she were unmarried; provided, that no gift from the husband to the wife shall be detrimental to the just claims of his creditors."

Soon after the adoption of the present constitution the legislature passed the "Act to carry into effect the provisions of the constitution in relation to the rights of married women," ratified January 27th, 1870, (14 *Stat.* 326), re-enacted in the General Statutes 482, which provides as follows: "That the real and personal property of a married woman, whether held by her at the time of her marriage or accrued to her thereafter, either by gift, grant, inheritance, devise, purchase or otherwise, shall not be subject to levy and sale for her husband's debts, but shall be her separate property."

SEC. 2. "A married woman shall have power to bequeath, devise or convey her separate property in the same manner and

to the same extent as if she were unmarried ; *and if dying intes-tate, her property shall descend in the same manner as the law now provides for the descent of the property of husbands ; and all deeds, mortgages and legal instruments of whatever kind shall be executed by her in the same manner and have the same legal force and effect as if she were unmarried."*

SEC. 3. " *A married woman shall have the right to purchase any species of property in her own name, and to take proper legal conveyances therefor, and to contract and be contracted with in the same manner as if she were unmarried.* That the husband shall not be liable for the debts of the wife contracted prior to or after their marriage, except for her necessary sup-port," &c.

In the outset it is claimed that in the effort to ascertain the powers of a married woman we must look *alone* to the constitu-tion ; that the act above cited purports to give to a married woman powers larger than those given by the constitution, *and to that extent* is without authority and void ; that the constitu-tion having undertaken to deal with the subject, its provisions are not merely fundamental, but legislative and exhaustive, and amount, by implication, to an inhibition against the legislature touching the subject. The parts claimed to be *beyond the consti-tution* are in italics. There is nothing in the act inconsistent with or in opposition to the constitution, but merely supple-mental thereto. Both are upon the same view and in the same line, the declared object of the act being " to carry into effect the provisions of the constitution."

It is not perfectly clear that the provisions of the constitution, necessarily stated in general terms, do not authorize the detail of particulars declared by the act. The first section of the act is in almost the very words of the constitution. The same may be said as to the second section, with the exception that for the word " alienate " is substituted that of " convey," with an addi-tional statement as to the modes of conveyance—" and all deeds, mortgages and legal instruments of whatever kind shall be exe-cuted by her in the same manner and have the same legal force and effect as if she were unmarried." There is also in this sec-tion another addition : that upon the death of the wife intestate

her estate "should descend as the law now provides for the descent of the property of husbands."

It is plain that these apparent additions were nothing more than stating fully and particularly what was properly inferable from the powers given in the constitution " to devise, bequeath or alienate." So as to the third section. Can it be fairly and with entire confidence affirmed that the powers expressly given in the constitution to acquire property " by gift, grant, inheritance, devise or *otherwise*," do not include and authorize the subordinate powers specified by the act " to purchase property in her own name and take proper legal conveyances therefor, and to contract and be contracted with?" It is asked with some force, how could she purchase or convey without the power to contract? It is insisted that *the particulars* of the act are nothing more than the filling up of the *general outline* indicated by the constitution. The constitution was adopted in 1868, and the act was passed in 1870, to a large extent by the same persons who had framed the constitution ; therefore, according to contemporaneous construction, the constitution allowed the provisions of the act, and they are not inconsistent but in harmony with each other. *Simpson* v. *Willard,* 14 *S. C.* 191.

But, assuming that some of the powers given by the act are not fully covered by the said section, but are over and above and supplemental thereto, is the act unconstitutional as to *such original provisions,* although not in violation of the terms or contrary to the spirit of the said section ? It is not contended that there is any express prohibition against the legislature passing the act, but that the very existence of the provisions of the constitution negatives, by implication, the right of the legislature to touch the subject at all. It is no small matter to declare an act of the legislature unconstitutional. The legislature is the law-making power of the state upon all subjects not prohibited by the constitution, every part of which should, if possible, be so construed as to allow full force to Section 1, Article III., which vests the full legislative power of the state in the general assembly.

" The English parliament, in a political sense, is omnipotent, but with us it is the people, and the people speak and act through the legislature, except when restricted by the constitution of the

United States or of the state.   No statute can be disregarded unless a constitutional violation can be pointed out."   *Thorpe* v. *R. & B. R. R. Co.*, 27 *Vt.* 142; *Potter's Dwar.* 60–65; *Cooley on Const. Lim.*, §§ 87–173.

"It is an axiom in American jurisprudence that a statute is not to be pronounced void on this ground, unless the repugnancy to the constitution be clear and the conclusion that it exists inevitable.   Every doubt is to be resolved in support of the enactment.   The particular clause of the constitution must be specified, and the act admit of no reasonable construction in harmony with its meaning.   The judicial function involving such result is one of delicacy and to be exercised always with caution."   *Township* v. *Talcott*, 19 *Wall.* 673.

"The constitutionality of a law must be presumed until the violation of the constitution is proved beyond all reasonable doubt, and a reasonable doubt must be solved in favor of legislative action and the act be sustained."   *Cooley on Const. Lim.*, § 87.

The general objects of a written constitution are to lay down the fundamental principles and to limit the powers of government, and not to legislate on mere details.   It is, in its nature, to be paramount, and in unchanging form is not suited to contain all the laws, which, from time to time, are necessary to conform to the ever-changing necessities and wishes of a people.

It is true that under certain conditions the power to legislate upon a subject may be taken away by a provision in the constitution simply affirmative as well as by express words, as where the provision is of such a nature that its purpose would be frustrated by further legislation on the subject, which occurs generally in reference to modes of procedure and in matters enumerated. But considering how easy it would have been to add words of exclusion, if such had been the intention, and that the alleged frustration of purpose must always be very much a matter of opinion, this "exhaustive grant" doctrine excluding, by implication, the power of legislation, is not favored.   Implied limitations of legislative power are only admissible when the implication is necessary, as where language, conveying a particular intent, cannot have its proper force without such implication.

2 P

" It is not upon slight implication and vague conjecture that it is to be pronounced that the legislature has transcended its. power, and that its acts are to be deemed void.   The opposition between the constitution and the law should be such that the judge feels a *clear* and *strong* conviction of their incompatibility with each other."   *Potter's Dwar.* 65.

It seems that one of the rules of construction in such cases is this : If the provision introduces a new subject, and nothing appears to the contrary, that provision may be regarded as containing its own limit ; but if the provision is upon the subject of ordinary legislation, in reference to which the legislature had acted before, that old right of legislation will not be taken away by implication, unless it is a necessary implication.   *Potter's Dwar.* 72–74.

This rule has an illustration in the case of *Duncan* v. *Barnett*, 11 *S. C.* 333, cited by the defendant.   That case involved the point whether the act of 1872, exempting from levy and sale " one-third of the annual products of agricultural laborers," *in addition* to the exemptions allowed by the constitution, was. for that reason unauthorized and void.   The constitution contains two provisions on the subject of homestead exemptions. Article I., Section 20, declares : " That a reasonable amount of property as a homestead shall be exempt from seizure and sale for the payment of debts," &c., and Article II., Section 32, indicates what is " a reasonable amount of property," by enumerating in detail the articles to be exempt, as follows: " The personal property of such person, of the following character, to wit : *Household furniture, beds and bedding, family library, arms, carts and wagons, farming implements,* tools, neat cattle, work ani-- animals, swine, goats and sheep, not to exceed in value in the aggre-- gate the sum of $500," &c.   This latter section, like an ordinary act of the legislature, indicates clearly *the articles exempt,* and this particular enumeration implies a limit.   The act assailed *added a new article,* not embraced in the list, and it was held that " the legislature can exempt from levy and sale only such articles of personal property as are embraced within the enumeration contained in Article II., Section 32 of the constitution."

In delivering the judgment of the court, Judge Willard said :

"Until within a few years it has not been regarded as a legitimate exercise of legislative power to place the property of the debtor beyond the reach of his creditor, except to an inconsiderable extent. * * * It may well be considered that in solving the question of the legitimacy of such legislation the constitution had in view *a limit* that should be imposed to its unrestricted exercise. *When it is treating of subjects that have been* constantly dealt with by legislative bodies, with the sanction of the courts and the community, such an inference does not necessarily arise. In such cases some special ground would have to appear by inferring, in the absence of an express declaration to that effect, that the constitution, in prescribing the mode in which a power of that class should be exercised, intended to exclude its exercise in any other mode."

The case before us is, in several particulars, different from that of Duncan *v.* Barnett. Here there is no second section filling up with particulars the general power given in the first, which office, in reference to the rights of a married woman, seems to have been performed by the act of the legislature now assailed ; and besides, in the matter now under consideration, the constitution was "treating of a subject that had been constantly dealt with by the legislature." The rights of married women have always been considered and treated as a legitimate subject of legislation in this state. Perhaps no other has been oftener before the legislature.

We can see no necessity for the implication in this case as drawn from the *frame* of the provision itself. It does not purport to be exhaustive or exclusive, but, in terms, is simply affirmative and without words of negation. The maxim *expressio unius est exclusio alterius* cannot control the construction. That doctrine as to the effect of omissions under certain conditions, might have some weight if, in this case, as in Duncan *v.* Barnett, a new subject of legislation had been then and there introduced by the constitutional provision ; but it is not perceived why it should be applied so as to limit, by implication, legislative powers which already existed in regard to an old and general subject of legislation.

Nor is there a necessity for the implication arising out of the

nature of the subject. Based on the law as it then stood, the main object of the provision in the constitution seems to have been, not so much to declare the rights of *the wife* as to negative those of *the husband* in regard to her property—not to *enable her*, but to disable *him and his creditors*, and, therefore, no exhaustive catalogue of all her powers was intended to be given, but only a mention, in general terms, of. such of them as were incident to the main purpose of excluding the rights of the husband. As was said in the case of Townsend *v.* Brown,* lately decided by this court, in reference to the mode of renunciation of a wife's dower under our present laws : " The leading object of the section just quoted [under consideration here] appears to have been to relieve the property of the wife from liability for the husband's debts, and to relieve it from any control by the husband ; for the *first provision* is to exempt the wife's property from levy and sale for the debts of the husband, and *the second* is to authorize the wife to dispose of her property without, and even against the consent of the husband. The real purpose, therefore, does not appear to have been to confer any new powers upon a married woman by changing her legal status, but simply to protect her property from liability for her husband's debts, and to release it even from the partial control of the husband by dispensing with the necessity, which had previously existed, of obtaining his consent and concurrence before her property could be disposed of. These seem to have been the real purposes of the clause in question, *and as they can be fully accomplished* without in any manner affecting any of the other relations between husband and wife growing out of marriage, we think we are bound to confine the operation of this clause of the constitution to its declared and manifest objects."

We conclude that there is nothing in the provision of the constitution upon the subject of the rights of married women which excludes the legislature from passing any act upon that subject that is not in violation of the terms of that provision ; and that the act of 1870, admitted to be in accord with both its terms and spirit, is constitutional, and has the force of law.

* To appear in 16 *S. C.*

The only other question remaining is whether the defendant, Mrs. Campbell, is liable to be sued to judgment on the notes as her personal contract. After protecting the property of a married woman from her husband's debts, it seems to have been the intention of the act to give to her the absolute right to contract without exception or qualification. The words are: "And to contract and be contracted with in the same manner as if she were unmarried; *provided* that the husband shall not be liable for the debts of the wife contracted prior to or after their marriage except for her necessary support." The proviso itself indicates that a married woman may contract debts *after marriage* other than those for her necessary support.

*Witsell* v. *Charleston*, 7 *S. C.* 88, decided in 1875. In this case there was a separate estate created by will *prior* to the constitution, and the principal question to consider was as to the effect the constitution has upon a separate estate which was in existence at the time of its adoption, and upon that subject we make no ruling here. It was, however, held "that under Article XIV., Section 8 of the constitution a married woman has power to alienate her equitable estate in stock held by her at the adoption of the constitution, and that she might pledge the same as security for her husband's debts." In referring to the married woman provision of the constitution in this case, the court says: "Its object was to enlarge what was before known as the wife's separate estate, so as to embrace all acquisitions, past or future, of such nature that if she were a *feme sole* they would vest in her as property, and to enlarge her powers over such property to the same extent *as if she were a feme sole*, and at the same time to shield that separate estate from liability to the husband's debts against her will. * * * Now that the constitution has reversed the rule of the common law, and substituted general competence for the former rule of incompetence as it regards the holding and acquisition of real estate, it is not for the courts, on nice readings of its text, to restore a state of things from which the courts of equity have long striven to be released. * * * We have been referred to cases decided in the courts of other states on statutes similar in their general intention to our own, some regarded as favoring the view that has been expressed, and others as opposing it. When the construction of our own constitu-

tion is free from doubt, little aid can be obtained from the decisions of the courts of other states. In the present case the meaning of our constitution is free from doubt, and it demands interpretation at our hands according to the expressed intent of the people of the state who framed it, as our organic law."

*Ross* v. *Linder* 12 *S. C.* 592, decided in 1879, is the only other case in our reports upon the subject. In that case, in considering the question whether the husband was a substantial or merely a formal party, the point arose incidentally whether a married woman could bind herself by a general personal engagement. It was held " that the ability of a married woman to bind herself by a contract cannot be disputed under the provisions of General Statutes 482."

In some of the states in which the power to contract has been given to a married woman, exceptions have been introduced limiting that power. In New York and New Jersey she is expressly restrained from assuming a liability *as surety*, but in Illinois she is not. The sixth section of the married woman's act of Illinois is in these words : " Contracts may be made and liabilities incurred by a wife, and the same enforced against her to the same extent and in the same manner as if she were unmarried, but, except with the consent of her husband, she may not enter into or carry on any *partnership business*, unless her husband has abandoned or deserted her, or is an idiot or insane, or is confined in the penitentiary." *Rev. Stat. Ill.*, 1874, *p.* 576.

A question arose in the State of New Jersey, as late as 1879, in regard to the liability of a married woman *as surety for her husband, contracted in the State of Illinois*, and the court of New Jersey, notwithstanding the express exception in their own law, held that the contract must be enforced according to the Illinois law, and that under the section above cited the wife was liable, and judgment was given accordingly. *Wright* v. *Remington*, 41 *N. J.* 51. In delivering the judgment, Justice Reed said : " The proviso contained in the fifth section of our married woman's act is absent from the Illinois statute, and there appears in the latter *no restriction upon the contractual ability of the married woman to become endorser, surety or guarantor*. Subject

to the exceptional instances of her engaging in *partnership business, she is as unrestricted as a feme sole.*    There can, therefore, be no question but that the contract was valid by the law of Illinois.    It is the duty of the courts of this state to recognize and enforce it unless it appears injudicious to the interests of the state or of our citizens.    But nothing approaching this result can be deduced, solely from the fact that the foreign statute confers upon the married woman the power to make a contract of suretyship.    That it would have been an act of legislative wisdom to have incorporated into the Illinois act a provision similar to that in our own and the New York State married woman's act, by which the married woman is restrained from assuming a liability as surety, I think the testimony in this case demonstrates.    But whatever may be our opinion of the policy of legislation beyond our state we are bound by the principles of comity to recognize its validity," &c.

In Massachusetts, under the act of 1874, which provides that " a married woman may make contracts, oral and written, sealed and unsealed, in the same manner as if she were *sole*, except that she cannot ' convey ' property to or make contracts with her husband," it has been held that a married woman was liable on a promissory note, although the consideration for the note was a debt of the husband.   *Major* v. *Holmes*, 124 *Mass.* 108 ; *Kenworthy* v. *Sawyer*, 125 *Mass.* 28 ; *Goodnow* v. *Hill et ux.*, 125 *Mass.* 588.

In Maine, under an act of 1866, declaring that " the contracts of any married woman made for any lawful purpose, shall be valid and binding, and may be enforced in the same manner as if she were *sole*," it was held " that a married woman was liable as surety on a note."   *Mayo* v. *Hutchinson*, 57 *Maine* 547.   In this case the court quaintly remarked " that the legislatures of this state have been gradually enlarging the rights and extending the liabilities of married women.   The wisdom or expediency of the act is a matter solely for the legislature.   Its language is not general, and there can be no reasonable doubt of its meaning. A contract of suretyship is a lawful contract, and for a lawful purpose.   It is valid and binding on a married woman. The married defendant may have been indiscreet in entering

into it, but that is not the fault of the plaintiff. Almost all who. sign as surety have occasion to remember the proverb of Solomon : ' He that is surety for a stranger shall smart for it ; and he that hateth suretyship is sure.' But they are nevertheless held liable upon their contracts, otherwise there would be no smarting, and the proverb would fail."

In Kansas, under a like statute, it has been held that a married woman was liable on a note signed by her, and she was not permitted to allege that she did not intend to charge her separate estate. *Derring* v. *Boyle*, 8 *Kansas* 529 ; *Wicks* v. *Mitchell*, 9 *Kansas* 88.

In Ohio the act of 1866 makes the property of a married woman her separate estate, but no special power to contract is given ; yet in the case of *Williams* v. *Hancock*, 35 *Ohio St.*, decided in 1880, it was held that a married woman having a separate estate, may charge the same in equity by the execution of a *promissory note for her husband or another*. From the execution of the note a presumption arises that she thereby intends to charge her separate estate with its payment, (overruling *Levis* v. *Earl*, 30 *Ohio St.* 147, and *Rice* v. *Railroad*, 32 *Ohio St.* 380.)

In New York there is given to a married woman no express power to contract ; but in the case of *Manhattan Co.* v. *Thompson*, 58 *N. Y.* 84, Judge Church seems to lament the absence of such power, in these striking words : " If, when the legislature changed the common law in essential particulars, in regarding the interests in property of the husband and wife to a considerable extent as distinct and independent, and in recognizing the capacity of the wife to judge and provide for what her welfare requires in acquiring and holding the legal title to property, and managing and disposing of the same as if unmarried, and without subjection to the control of the husband, the courts had adopted as a reasonable and legitimate sequence the corelative rule of capacity to contract debts as if unmarried, restricted only to their collection from separate property, it might well be claimed that the rights of married women would have been as well, if not better, protected practically, sound public policy and business morality more promoted, and a flood of expensive and vexatious litigation prevented." Mr. Wells, in commenting on

these views of Judge Church, remarks : " Manifestly, it must come to this everywhere."

In the case before us, Mrs. Campbell did not sign as surety for her husband, but for the firm of A. R. Campbell & Co., of which her son was a member. Therefore, none, of the considerations of bad policy as to the wife's being allowed to sign as surety *for her husband* apply here. But, in considering the general subject, it is proper not to overlook the dangers of such a power under all circumstances.

It has been strongly urged upon us that to give a married woman the unrestricted right to bind herself by contract must result in the destruction of her separate estate ; that, so far as her property is concerned, it will put her absolutely in the power of her husband, if not under his baronial authority, certainly under the influence of her affection for him ; that every good wife will contribute her last cent to promote the success or to maintain the credit and honor of her husband. It is not for this court to consider the wisdom or policy of the law. That is exclusively for the legislative branch of the government. Our duty is simply to announce what the law is—not what it should be. It may not, however, be inappropriate to say that all the old confusion would at once follow the renewed effort to give the wife two inconsistent characters—that of a *feme sole* without disabilities as to the power to acquire and hold property, and that of a *feme covert* under disabilities as to the mode of charging that property and making it liable for her contracts. With every enlargement of the rights of a married woman should come a corresponding increase of her responsibilities. When they take the right to control their separate estates they assume the risks of such control. When the law gives them the privileges of separate individual citizens, they take with it the responsibilities and dangers of such citizens. Given the right to contract, they assume the liabilities of contractors. At first hardships may, in isolated instances, ensue from the inexperience of women in matters of business, but such hardships always arise upon any change in the rules of property or business.

We cannot refrain from making the further observation that if the apprehended consequences should to some extent follow

the radical change in the law, some compensation may be found in its tendency, from another direction, to restore the old condition of absolute unity in interest of husband and wife. In the language of Chancellor Wardlaw : "We trust it may never be considered improper for the wife to contribute, by all lawful means, to the success of her husband's enterprises. In many cases it is both politic and dutiful that such power should be exercised."

The judgment of this court is that the judgment of the Circuit Court be affirmed.

SIMPSON, C. J., and McIVER, A. J., concurred.