19788

Wilton J. McKINNEY and Robert B. Bruce, Appellants, v. The CITY OF GREENVILLE, et al., Respondents.

(203 S. E. (2d) 680)

228

*Robert A. Clay, Esq.,* of Greenville, *for Appellants,* ■

230

*Messrs. C. T. Wyche and James C. Parham, Jr.,* of
*Wyche, Burgess, Freeman & Parham, W. H. Arnold,* of
*Love, Thornton, Arnold & Thomason, Robert O. Conoley,*
and *E. P. Riley, Sr.,* of *Riley & Riley, all* of Greenville,
*for Respondents,*

March 18, 1974.

*Per Curiam:*

The order under appeal correctly disposes of the issues
and, with certain deletions, will be reported as the judg-
ment of the Court.

## ORDER OF JUDGE EPPES

This matter comes before me on action for declaratory judgment, under The Uniform Declaratory Judgments Act, Section 10-2001 through 10-2014, Code of Laws of South Carolina, 1962, seeking a determination that a lease and option to purchase 100.62 acres of County lands, executed by Greenville County to Olin Corporation is invalid, and further, that the County should be enjoined from further compliance therewith. The Complaint further alleges that the purchase of an undivided interest in these lands by Greenville County from the City of Greenville, in order to enter into this agreement, is also invalid.

The lands in question are 100.62 acres within Donaldson Center, an industrial complex owned jointly by the City and County of Greenville and lying outside the City limits at the former site of Donaldson Air Force Base. The Donaldson Air Force properties, a total of approximately 2,450 acres, were purchased jointly by the City and County of Greenville in 1942, and leased to the United States Government for use as an air base. The air base was closed in the early 1960's, and since that time the City and County have jointly developed the property as an industrial park, through sales and leases to private industry. Immediately prior to the transaction in question on May 18, 1971, approximately 320 acres of the original tract had been disposed of, leaving approximately 595 acres available for further development, excluding the runway facilities.

In early 1971, members of the Greenville business community became aware of the interest of Olin Corporation, one of the 100 largest corporations in the United States, in constructing a new manufacturing facility, either in Greenville County, or elsewhere in South Carolina or on lands in North Carolina already owned by the company. Further discussions with representatives of Olin led to the conclusion that the location of this new industry in Greenville County would be of significant benefit to the economic

development of the area. The new facility would manufacture polymer type film through a "clean process" with very little by-product of a polluting nature, and would employ skilled workers, technicians and engineers. Further, this type industry would add to the diversification sought by this area to broaden the base of the economy. It was further clear that the other sites being considered by Olin presented strong competition, and that in order to attract Olin to Greenville, it would be necessary to make them an attractive offer.

The agreement finally entered into includes a lease to Olin of the 100.62 acres for successive periods of 10 years, 15 years, 25 years, 25 years, and 24 years, for a total of 99 years. No cash lease payments as such are required under the agreement, however, Olin is committed to place on these premises certain capital improvements so that by the end of each successive term of the lease the total capital investment thereon, subject to County *ad valorem* taxes, shall be as follows:

Initial term of 10 years, not less than ten million ($10,-000,000) Dollars

Second term of 15 years, fifteen million ($15,000,000) Dollars

Third term of 25 years, twenty million ($20,000,000) Dollars

Fourth term of 25 years, twenty-five million ($25,000,-000) Dollars

Fifth term of 24 years, twenty-five million ($25,000,000) Dollars

Until such time as the capital improvements specified for each term are completed by Olin, the lease is not renewable for the following term, and, on the other hand, when a total capital investment of twenty-five million ($25,-000,000) Dollars has been made on this facility, Olin shall be entitled to a lease for the remainder of the 99 year period

without further obligation for investment other than to maintain said properties in a good state of repair.

Olin shall be obligated to pay all property taxes legally assessed against the value of all of the improvements placed by it on the leased premises, as well as any personal property located thereon, but no taxes shall be payable by Olin on the value of the land itself.

In addition to the lease with extensions described above, Olin is granted an option to purchase the 100.62 acres at any time during the initial term of 10 years for $2,500 per acre, and during any subsequent extension period for the then appraised fair market value, excluding the value of improvements placed thereon by Olin. Whether or not the option to purchase is exercised, Olin is obligated to expend on the premises during the first 10 year period beginning with the date of the lease, a minimum of ten million ($10,-000,000) Dollars, construction to begin within two (2) years of the execution of the lease and to be pursued with reasonable diligence. (Testimony indicates that Olin's investment to date, some 18 months after the execution of the lease, is already in excess of ten million [$10,000,000] Dollars.)

If Olin fails to extend the lease at the end of any term, fails to exercise the option to purchase, or is required to abandon the premises by reason of default all improvements becoming a part of the realty, shall revert to Greenville County.

In the event the lease is terminated by reason of Olin's failure to begin within two (2) years and complete with reasonable diligence capital improvements of at least ten million ($10,000,000) Dollars during the first ten (10) year term, Olin shall pay as liquidated damages the sum of $70,000, plus $3,000 per month for each additional month, or part thereof, after the first two (2) years until the lease is terminated pursuant to its terms.

The lease recites in its preamble that under the provisions thereof, and the taxable value of improvements contemplated

thereby, the property tax revenues payable to Greenville County will exceed the annual return that might be derived by the County from any other available sale or lease of the property in question.

Prior to the execution of the agreement, the County of Greenville had purchased from the City of Greenville the City's undivided interest therein at a price of $3,500 per acre, so that the transaction as finally consummated was between Olin and Greenville County. Apparently, since the City of Greenville could not share in the tax revenues contemplated by the agreement, they preferred not to be a party to the lease or the option to sell.

The Complaint, in a comprehensive treatment of the transaction, alleges that the lease is invalid for a number of reasons which may be summerized as follows: (1) the statute under which Greenville County entered into this agreement (Act Number 573, of 1967, creating the Greenville County Council, as amended by Act 111 of 1971, Section 1, Subitem 3 of Item [b] of Section 9) violates the South Carolina Constitution, Article III, Section 31, which prohibits donation of lands belonging to or under the control of the State to private parties, and Article X, Section 6, which provides that the credit of the State shall not be pledged or loaned for the benefit of any corporation; (2) the lease itself violates the same constitutional provisions; (3) even if the statute involved meets constitutional requirements, the lease does not comply with the statute since neither the lease nor the option properly takes into account the value of $3,500 per acre established by the purchase of the City's interest, and the agreement cannot be justified on the basis of the other consideration relied upon by the County; (4) the agreement is *ultra vires,* an abuse of authority and discretion and violative of Greenville's fiduciary obligation to Plaintiffs and other taxpayers of the County in that it involves a "donation" of public property to private use, a disposition of County properties at less than fair

market value, would remove valuable properties from tax rolls (in the case of the lease), would be unfair to other industries which have purchased properties in Greenville County, and would amount to competition by the County with private industry; and (5) the agreement is invalid since, in order to enter into same, Greenville has purchased, and obligated itself to pay for, the City's individed one-half (½) interest for use other than for a public purpose thereby violating constitutional and statutory limitations.

The Complaint prays for a determination that the statute in question violates the Constitution, that the lease agreement is illegal, *ultra vires,* against public policy, an abuse of authority, in violation of Greenville's fiduciary duty, and that the deed from the City of Greenville to the County of Greenville is invalid.

The Defendants, Greenville County, and Olin Corporation, have answered generally in the same vein, admitting the execution of the lease agreement with option to purchase and denying any constitutional or other defects in the statute or the lease agreement. More specifically, these Defendants allege that Article III, Section 31 of the South Carolina Constitution is not applicable since it applies only to lands belonging to or under the control of the State, but even if the Section is applicable, the statute and transaction in question do not permit or involve a donation since they satisfy all requirements for proper consideration; the statute requires "fair and reasonable value" for any disposition of County properties, and the agreement requires fair and reasonable value in the form of indirect benefits to the County from the addition of this new and highly-desirable industry, including tax revenues of a minimum assured level, which will exceed any likely revenues to the County from any other available disposition of this property, and further, that the requirements for fair and reasonable value under the statute, and the consideration upon which this lease agreement is based, are in complete accord with the de-

cisions of the South Carolina Supreme Court permitting a governmental body to dispose of its property for less than fair market value, in the common sense, when other reasonable benefits are derived thereby.

In response to Plaintiffs' objections that the lease agreement is competitive with, and unfair to, other private industry, the said Defendants allege that the arrangement with Olin is within the statutory and constitutional authority of the County and is supported by full and adequate consideration. Finally, these Defendants contend that without the lease and option to purchase as finally consummated, Olin Corporation probably would not have chosen Greenville for location of its new facility.

The City of Greenville has answered, admitting the execution of the lease agreement between Greenville County and Olin, denying that the City of Greenville is a proper party to this action, but if held to be a proper party, alleges, on information and belief, that the actions of Greenville County and Olin were reasonable, legal, proper and were for the best interest of Greenville County and the citizens of the County, and should be ratified by the Court.

This matter came on to be heard before me on December 18, 1972, in Greenville, at which time evidence and testimony were presented and arguments made by counsel for all parties. The testimony may be summarized as follows:

George F. Miller, Tax Collector for Greenville County for some twenty (20) years, testified that, based upon the existing millage, at the time of execution of the lease agreement in May of 1971, and the method of valuation followed by the South Carolina Tax Commission for industrial properties at that time, the following revenues would be payable to Greenville County from Olin and if the lease runs for 99 years:

## PROJECTED COUNTY TAX REVENUES

A. Assuming Olin Corporation leases for 99 years
B. No increase in millage or valuation rate
C. Five year manufacturer's exception applied

Total Lease Period, 1971-2070

Tax District 145, East Gantt, 176 Mills

| Year | Plant Value | Assessed Value | Millage | Annual Tax | Total Tax |
|---|---|---|---|---|---|
| 1971—1976 | $10,000,000 | $ 950,000 | .141.5 | $134,425 | $ 672,125 |
| 1977—1986 | 10,000,000 | 950,000 | .176 | 167,200 | 1,672,000 |
| 1987—1991 | 10,000,000 | 950,000 | .176 | 167,200 | |
| | 5,000,000 | | .141.5 | 67,212 | 1,172,060 |
| 1992—2006 | 15,000,000 | 1,425,000 | .176 | 250,800 | 3,762,000 |
| 2007—2011 | 15,000,000 | 1,425,000 | .176 | 250,800 | |
| | 5,000,000 | | .141.5 | 67,212 | 1,590,060 |
| 2012—2033 | 20,000,000 | 1,900,000 | .176 | 334,400 | 7,356,800 |
| 2034—2038 | 20,000,000 | 1,900,000 | .176 | 334,400 | |
| | 5,000,000 | | .141.5 | 67,212 | 2,008,060 |
| 2039—2070 | 25,000,000 | 2,375,000 | .176 | 418,000 | 13,376,000 |

Total Taxes over 99 Year Period $31,609,105

The projections assume no increase in millage or valuation rate during this period. Mr. Miller further testified that neither the millage nor assessment rate has decreased since 1971, and, of course, that if either millage or assessment rate is increased, tax revenues from these improvements would increase accordingly. According to Mr. Miller's testimony, therefore, assuming a value of $3,500 per acre (for a total value of $352,170 for 100.62 acres) as contended by Plaintiffs, the projected tax revenues to Greenville County after completion of $10,000,000 worth of construction, required in any event, would amount to an annual return of over 38% during the first five years thereafter

when the new manufacturer's exemption is applicable, and over 47% for the remainder of the taxable life of these improvements.

Mr. Wilkins Norwood, a well-qualified realtor, . . . testified that he appraised the properties in question in November of 1970 for the Greenville Chamber of Commerce as having a fair market value of $350,000, or $3,500 per acre as industrial property, its highest and best use, and further, that he up-dated and confirmed this same value, in writing, to the Chamber of Commerce sometime in 1971. He further testified that as one experienced in development of commercial and industrial real estate, it is economically feasible to dispose of property in such a development for a sale or lease price less than the usual fair market value appraisal if other indirect benefits will accrue to the developer by reason of the presence of a particular commercial or industrial facility in the development. Mr. Norwood was not familiar with the details of the agreement with Olin, but testified, in answer to a hypothetical question, that, in his opinion, a governmental body with taxing authority could well justify, from an economic point of view, disposing of lands owned by it for sales or lease prices less than the appraised fair market value if the purchaser or lessee contractually commits to construct improvements which would produce tax revenues annually in excess of 20% of the appraisal value of the land. He further stated that assuming the existence of such factors in the case of the property in question, he would say that the County would be justified in disposing of same for less than $3,500 per acre, in the case of a sale, or in the case of a lease, for less than whatever the appraised fair market lease value might be. Mr. Norwood also testified that the Southern Railway Company had purchased a large tract of land in close proximity to Donaldson Center to the south for development as an industrial park, and that in order to attract desirable industry to their development, he was aware that they were willing to sell portions of this property at a price less than they had paid for it.

Mr. A. D. Asbury, Chairman of the Greenville County Planning Commission, Chairman of the Donaldson Center Management Committee, and a retired engineer, . . . testified that the Donaldson Center Management Committee had been requested by the Greenville County Council to review the plans for the new facility presented by Olin Corporation, and that the Committee had approved same. He further testified that although the Donaldson Center Management Committee was not involved in the final decision to approve the lease agreement with Olin, that, in his opinion, an annual return in excess of 20% of the appraised value of property of this type is a "good investment at any time". He further testified that, based upon his experience and knowledge of the Greenville area, the addition of a manufacturing facility such as that contemplated by the agreement with Olin would be beneficial to the economy of the Greenville area and in accord with the policy of the Donaldson Center Management Committee to encourage diversification of industry.

Mr. Robert B. Vaughn, Chariman of the Greenville County Council at the time of the agreement with Olin, testified that he and other members of the County Council at that time were convinced that the addition to the Greenville area of Olin's new facility would be of great benefit to the County.

The desirable nature of the new facility with its clean process and relative absence of polluting by-product, and, most important, the addition to diversification of the Greenville economy, as well as the guaranteed tax revenues to the County assured by the terms of the agreement, were cited by Mr. Vaughn as forming the basis of this decision. Mr. Vaughn further testified that he was assured by representatives of Olin that Greenville County would lose this new industry if they did not enter into the lease agreement as finally agreed upon. He also testified that since the City of Greenville would not share in anticipated property tax reve-

nues, the only available means of entering into the agreement with Olin required a purchase by the County of the City's undivided one-half interest. The vote in the County Council, by which it was decided to execute the lease agreement with Olin, was unanimous. Mr. Vaughn also noted as a matter of interest, that County Council has adopted the policy of making payments to the City for this property out of income received by the County from sales and leases of properties at Donaldson Center.

Mr. Herbert L. Gibson, Vice President of Operations of Olin Corporation, testified that as of the present time, some eighteen months after execution of the lease agreement, Olin had already placed upon the leased premises capital investments valued in excess of ten million ($10,000,000) Dollars, and that although he has no definite information concerning what the total amount of the final investments will be, or whether or not Olin intends to exercise the option to purchase, he is certain that Olin intends to comply with all of its obligations under the agreement. Mr. Gibson further testified that at the present time, Olin has employed fifty-five (55) salaried employees and eighty-three (83) hourly employees, that approximately one-third of the salaried employees are engineers that all of the hourly employees are skilled workers having received special training for these jobs, and that the average pay of the hourly employees is higher than the average pay for other industrial wage earners in Greenville County. By 1973, when the plant is expected to be in full production, salaried employees should number around seventy-five (75), and hourly employees around ninety-five (95). Mr. Gibson confirmed that Olin had obtained all required permits from the S. C. Pollution Control Authority, including a water permit and air permit, and that the installation complies in all respects with South Carolina laws. Olin has constructed on the premises, at a cost of approximately $200,000, a sewage disposal plant to treat its industrial effluent. Mr. Gibson further confirmed that the lease agreement as finally executed played a major

role in Olin's decision to locate in Greenville and that in the absence of the special considerations included in the agreement, Olin probably would have chosen a site other than Greenville. Several photographs of the Olin plant were introduced into evidence by Mr. Gibson. These photographs show an attractively designed and well-constructed building with neatly landscaped surroundings.

After a study of the pleadings and the issues raised therein, and considering all of the evidence, testimony and arguments of counsel, I am convinced that the allegations of the Complaint are without merit and should be dismissed.

The statute from which Greenville County draws its authority for this transaction (Act 573 of 1967, as amended by Act 111 of 1971, Section 1, Subitem 3 of Item [b] of Section 9) reads as follows:

"3. To lease, sell or otherwise dispose of real and personal property in the name of the county, including all such property now owned by the county based upon a fair and reasonable value. In determining fair and reasonable value, County Council shall take into account a value to be determined by one or more appraisals made by competent realtors and may take into account prospective tax revenues from improvements to be constructed on the property as well as any other considerations. Any transfer of property, upon being approved by at least six members of County Council, shall be signed by the chairman and clerk of County Council.

All prior sales and leases heretofore made of real and personal property now or formerly of Donaldson Center property are ratified, affirmed and approved."

The primary challenge to the statute is that it permits an unconstitutional "donation" of State lands, since its provisions pertaining to consideration are so broad and vague as to provide no adequate requirements of proper consid-

eration and, therefore, permits disposition of State lands for less than fair market value.

It is well-settled by the decisions in this State that a statute will, if possible, be construed so as to render it valid, and courts should not declare a legislative enactment unconstitutional unless its invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution. *Peoples National Bank of Greenville v. South Carolina Tax Commission*, 250 S. C. 187, 156 S. E. (2d) 769 (1967), and, *Atlantic Coast Line Railroad Company v. South Carolina Public Service Commission*, 245 S. C. 229, 139 S. E. (2d) 911 (1965).

I am of the view that Article 111, Section 31 of the South Carolina Constitution of 1895, has no application to the statute in light of the clear requirements of the statute that the disposition of any couny property be based upon "fair and reasonable value". Under no reasonable construction of this language could Greenville County make a donation of its property. This conclusion is required not only by the clear and unequivocal meaning of the terms, "fair and reasonable" themselves, but also by the additional language in the statute requiring that in determining what is fair and reasonable value, the County Council shall take into account the appraisal of one or more competent realtors, and may take into account prospective tax revenues from improvements to be constructed on the property, as well as any other considerations. Nowhere in the statute is there the slightest suggestion that the County may dispose of its property for less than a fair and reasonable value.

It is established beyond question by the decisions of the Supreme Court of South Carolina that a public body may properly consider indirect benefits resulting to the public in determining what is a fair and reasonable return for disposition of its properties without running

afoul of the constitutional prohibition against donations. *Elliott v. McNair,* 250 S. C. 75, 156 S. E. (2d) 421 (1967); *Bobo v. City of Spartanburg,* 230 S. C. 396, 69 S. E. (2d) 67 (1956); *State v. Broad River Power Company,* 177 S. C. 240, 181 S. E. 41 (1935); *Babb v. Green,* 222 S. C. 534, 73 S. E. (2d) 699 (1952); *O'Dowd v. Waters,* 130 S. C. 232, 125 S. E. 644 (1924); *Antonakas v. Anderson Chamber of Commerce,* 130 S. C. 215, 126 S. E. 35 (1924); *Haesloop v. City Council of Charleston,* 123 S. C. 272, 115 S. E. 596 (1923); *Chapman v. Greenville Chamber of Commerce,* 127 S. C. 173, 120 S. E. 584 (1923). In *State v. Broad River Power Company, supra,* the Court stated (at page 264 of 177 S. C., at page 52 of 181 S. E.):

"These cases establish the rule that the indirect benefits expected to result from the improvement of the land granted, by way of the promotion of the public convenience, increase in the value of adjacent property, and taxes to be paid on the improvements themselves are sufficient to keep such a grant from amounting to a donation within the constitutional inhibition."

And, in *Eliott v. McNair, supra,* (at page 95 of 250 S. C., at page 432 of 156 S. E. 2d):

"Nowhere in our decisions do we find a holding which requires public agencies to sell property at not less than full market value. Our decisions clearly hold that a public agency may exercise discretion in effecting a sale of public property and that neither public bidding is required nor is there a requirement that the maximum price be obtained. Indirect benefits to result to the public may properly be considered."

Further, in view of the foregoing, it cannot be said that there is anything in the statute permitting county lands to be sold to corporations, or associations, for a less price than that for which it can be sold to individuals, or that dispositions made according to its terms could involve a pledge or loan of the credit of the State

for the benefit of any individual, company, association, or corporation, or the use of the power of taxation for other than a public purpose. These objections, therefore, are also without merit.

■ The constitutional prohibition against donations is inapplicable here for the further reason that no lands "belonging to or under the control of the State" are involved, but rather, lands originally owned by private citizens and purchased by the City and County of Greenville for leasing to the United States Government. It is well-settled in several of the decisions of the Supreme Court cited above, that Article III, Section 31 of the State Constitution applies only to lands held by the State in its capacity as sovereign proprietor. In *Haesloop v. City Council of Charleston, supra,* it was stated (at page 278 of 123 S. C., at page 598 of 115 S. E.:

"If so, it is apparent that the real estate here involved is not, and was not at the time of the adoption of the Constitution of 1895, 'lands belonging to or under the control of the state' within either the letter or the reasonable intendment of the language there employed. While all lands within the state's borders are at all times in a sense 'under the control of the state' in its governmental capacity—that is, subject to regulation and appropriation in the legitimate exercise of its powers of police and of eminent domain—manifestly, we think, the reference in this constitutional provision is to public lands belonging to and controlled by the state in its capacity as sovereign proprietor. Had the land here involved been granted by the state to an individal, and subsequently conveyed to the city council, it would scarcely be contended that at the time of the adoption of the Constitution of 1895 it was land 'belonging to or under the control of the state.' . . . At the time of the subsequent adoption of the Constitution, the state having divested itself of title by a valid legislative grant, this real estate could no more properly be characterized or claimed as 'lands belonging to or under the control of the state'

than any other land held by private owners, as all such lands are held, under original grant from the state."

See also *Bobo v. City of Spartanburg, supra,* wherein Article III, Section 31, was held inapplicable for the same reason.

I conclude further that the lease agreement itself between the County of Greenville and Olin Corporation complies fully with the requirements of the statute, as well as the constitutional provisions raised by Plaintiffs. The Greenville County Council has satisfied all requirements of the statute in taking into account the appraisal of Mr. Wilkins Norwood, a competent realtor, and in arriving at a consideration for the lease agreement which is clearly fair and reasonable, and approving same by unanimous vote of County Council. In taking into account in this determination of fair and reasonable value the prospective tax revenues from improvements to be constructed by Olin on the property, as well as the other facets of the new industry which will be beneficial to the public in Greenville County, the County Council has acted in accord with the statute and with the South Carolina Constitution as interpreted by the South Carolina Supreme Court. I find that if the terms of the lease agreement are complied with by Olin, Greenville County will receive value which is definitely fair and reasonable.

As a matter of fact, the evidence indicates that the County will receive consideration which will exceed that of any other available disposition of the property in question, whatever alternative Olin choses to follow from among those available to it under the agreement. If Olin chooses to lease for the entire 99 year period, it must construct taxable improvements which, at 1971 tax millage and assessment rates, should result in tax revenues to Greenville County during this period of over thirty million ($30,000,000) Dollars, or an average of over $300,000 per year, which is over 85% of the present appraised value of the land in question.

Although not necessary for a determination of these questions, it would be wholly unrealistic to assume that the property tax millage and/or valuation rates will not be increased significantly over this period. In addition, skilled and highly-trained personnel which are desirable for the area will be employed by Olin adding substantial payroll to the local economy and to the diversification of Greenville's industry. At the end of the lease, both the land and the inprovements thereon which have become a part of the realty, will revert to Greenville County. Whether Olin continues the lease, on the one hand, or exercises the option to purchase the land, on the other, at least ten million ($10,000,000) Dollars worth of improvements must be placed on the land, which at 1971 millage and assessment rates should result in tax revenues to the County of $134,400 during the first five years (taking into account the exemption from certain taxes of new construction for manufacturing under Sections 65-1524 and 65-1527 of the Code of Laws of South Carolina), and thereafter, $167,200 annually. Construction must begin within two years (by May 18, 1973) and to be pursued with reasonable diligence. I find that improvements valued in excess of ten million ($10,000,000) Dollars have already been placed on the premises by Olin as of this time.

. . . Thus, even though the lease requires no cash payments by Olin for rental as such, and although the option would permit Olin to purchase the land for $2,500 per acre, less than the appraised fair market value, I find that the total value to be received by the County of Greenville under this agreement is eminently fair and reasonable.

The objection by Plaintiffs that this transaction is *ultra vires,* an abuse of authority and discretion and violates the County's fiduciary duty to Plaintiffs and other taxpayers, is also without basis. The fact alone that the transaction is based upon fair and reasonable consideration is sufficient answer to these objections. In addi-

tion, the decisions of Greenville County in this regard should not be disturbed except upon a clear showing of fraud or abuse of authority. *Bobo v. City of Spartanburg, supra; Carter v. City of Greenville,* 175 S. C. 130, 178 S. E. 508 (1934) ; and *Green v. City of Rock Hill,* 149 S. C. 234, 147 S. E. 346 (1929).

. . .

. . . I am convinced that the instant transaction ■ is sound and for a valid public purpose. It has been recognized in this State that our courts will not interfere with legislatively declared policy and legislatively approved functions of government unless the judicial mind is convinced that action by the legislative body is without reasonable relation to the public interest or welfare and is beyond the scope of legitimate government activity, and further, that a public agency may exercise its discretion in effecting a sale of public property. *Elliott v. McNair, supra.*

In light of the foregoing facts and authorities, it is ■ clear that the Greenville County Council has not abused its authority or discretion or violated its fiduciary duty to Plaintiffs and other taxpayers and citizens of the County, and further, that it has acted well within its power and authority. . . .

The City of Greenville is a proper party to this action and, for the same reasons set forth above, the objections raised with regard to the deed from the City of Greenville to the County of Greenville conveying the City's undivided one-half interest are also without merit.

On the basis of all of the foregoing, therefore, I find that the Complaint should be dismissed with costs.