21757

SOUTH CAROLINA FARM BUREAU MARKETING ASSOCIATION, Plaintiff, v. SOUTH CAROLINA STATE PORTS AUTHORITY and Daniel R. McLeod, Attorney General of the State of South Carolina, Defendants.

(293 S. E. (2d) 854)

*M. John Bowen, Jr.*, and *Randall T. Bell*, of *McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble*, Columbia, *for plaintiff.*

*Atty. Gen. Daniel R. McLeod* and *Asst. Atty. Gen. Clifford O. Koon, Jr.*, Columbia, and *William H. Vaughan, Jr.*, Charleston, *for defendants.*

July 19, 1982.

GREGORY, Justice:

This action is brought in the original jurisdiction of this Court under the Uniform Declaratory Judgments Act, S. C. Code Ann. §§ 15-53-10 through 15-53-140 (1976 and Cum. Supp. 1981) by the South Carolina Farm Bureau Marketing Association (the Association) in order to determine the validity of an agreement between the Association and the South Carolina State Ports Authority (the Authority) for the operation and management of the Authority's grain elevator and storage facilities at its North Charleston terminal.

Subsequent to a report issued by the Legislative Audit Council, the Attorney General issued an opinion questioning the validity of the Management Agreement between the Association and the Authority. Public Funds, State Ports Authority, 1981 Op. Att'y Gen. No. 81 (June 15, 1981). The Attorney General found the agreement was entered into for a valid public purpose, but was of the opinion the agreement was not valid because it provided a private corporation with a profit while it caused a net loss to the State. The Attorney General concluded the agreement did not constitute a legal contract, hence, this declaratory judgment action.

## BACKGROUND

In the 1950's the South Carolina General Assembly recognized the need to link South Carolina with international markets. At that time the only practical way to export grain was through Norfolk, Virginia.

In 1956, the General Assembly passed Act No. 821, Acts and Joint Resolutions, South Carolina, 1956, Regular Session, which authorized a bond issue of $10 million to construct docking facilities and provide facilities to export soybeans and other small grains. To repay the principal and interest on the bonds, this Act pledged the full faith, credit, and taxing power of the State and net revenues derived from operation of the Authority's facilities.

In 1957, Act No. 821 was amended to increase the bond indebtedness to $21 million and to replace the pledge of operating revenues with a directive to the Budget and Control Board to determine annually the portion of revenues to be used toward repayment. Act No. 32, Acts and Joint Resolutions, South Carolina, 1956, Regular Session.

In 1961, Act No. 821 was again amended by the General Assembly to authorize an additional $1 million bond issue for building the grain facility. Act No. 207, Acts and Joint Resolutions, South Carolina, 1961, Regular Session.

The grain elevator was completed in 1962 at a cost of $2,974,818.[1] In October 1962, the Authority entered into a management agreement with the plaintiff for the operation of the grain elevator.

The demand for the use of the elevator exceeded its capacity and in 1965, Act No. 821 was amended to provide an additional bond issue of $2.5 million to expand the elevator. Act No. 486, Acts and Joint Resolutions, South Carolina, 1965, Regular Session. The amendment provided for a per bushel charge on all grains passing through the elevator sufficient to repay principal and interest on the bonds. The original management agreement was then superseded by an agreement which provided for this per bushel charge.

In 1965, expansion of the grain elevator was completed at a cost of $2,529,902, bringing the total cost to $5,460,020.

---

[1] References made to "the grain elevator" or "the elevator" include both the elevator and its storage facilities.

The grain elevator was operating successfully, but the Association was losing money on the operation.[2]

In 1970, Act No. 821 was again amended to eliminate the per bushel fee imposed for the use of the elevator. Section 8 of Act No. 1272, Acts and Joint Resolutions, South Carolina, 1970, Regular Session. Subsequently, the Management Agreement was modified to eliminate the per bushel fee and to provide for a fixed rent.[3]

The present Management Agreement was entered into in 1977. The initial term is from 1977 to 1983 with an option to renew for fifteen years. Fixed annual rent is $60,500.00. Additionally, the Association agrees to spend $2 million on improvements, to pay all costs, charges, or rents connected with the operation of the elevator, and to maintain all machinery, the facilities, and improvements. The Association is granted complete and exclusive custody of the elevator as an independent contractor. The Association provides insurance covering damage to the equipment, bodily injury and property damage liability, and motor vehicle liability. The Authority provides insurance on the buildings and berthing facilities.

The Association has spent in excess of $1.8 million to date on improvements to the state-owned facility. Neither the defendant Authority nor the State has contributed any funds for the operation of the elevator or its improvements. The only expenditure by the State has been its capital investment to build and expand the elevator. This was financed primarily by the proceeds of general obligation bonds[4] which were duly authorized by the General Assembly and the validity of which has not been questioned by the Attorney General.

---

[2] Most of the loss occurred in the 1969-1970 fiscal year. The Association's management estimated freight charges and the necessary operating margin to determine the price of soybeans "FOB destination" from Charleston. A sharp increase in ocean freight charges and increased soybean prices left the Association with severe losses.

[3] The prior agreements were profit-sharing agreements with no fixed rental payments.

[4] The retirement date of the bonds is April 30, 1986.

## ARGUMENT

Article X, Section 11 of the Constitution of the State of South Carolina provides in pertinent part:

> The credit of neither the State nor any of its political subdivisions shall be pledged or loaned for the benefit of any individual, company, association, or corporation ....

The Attorney General argues Act No. 1272 of 1970 is unconstitutional because it pledges the credit of the State primarily for the benefit of a private corporation. He concedes, however, that the operation of the grain elevator is for public purpose and that the Authority may contract with a private party to operate the elevator.

The Attorney General also concedes Act No. 821, as amended was constitutional up to the 1970 Amendment in Act No. 1272. He argues that the removal of the per bushel fee to repay the principal and interest on the bonds leaving only a pledge of the credit of the State and a directive to the Budget and Control Board to determine annually the amount of revenue of the Authority's operations to be used for repayment is unconstitutional. He asserts the removal of the per bushel fee resulted in the expenditure of State funds to save the Association from financial ruin. What he fails to consider, however, is that bidding for operation of the grain elevator was opened after this amendment was enacted. If the Association had not received the lease, it would have had to completely absorb its losses. As it happened, the Association won the bidding, continued the operation, regained its losses, and rebuilt its working capital.

Act No. 1272 contains the same pledges for repayment of principal and interest on the bonds as Act No. 32 of 1957 and Act No. 207 of 1961. It is illogical that these latter Acts are considered by the Attorney General to be constitutional and the former Act is challenged as unconstitutional.

It appears the Attorney General's argument, while ostensibly a constitutional challenge, is in reality an argument that the agreement between the Authority and the Association is a "bad bargain." His chief complaint is the State is losing money while the Association, a private corporation is making a profit. From an accounting standpoint, the State is losing

money. It is depreciating the grain elevator on the same schedule it is amortizing the bonds. On this basis, the elevator will have a zero value in 1986 when the bonds are fully amortized.

In truth, the State is not losing money. The grain elevator is constructed of concrete and is permanent in nature. Although the equipment must be replaced approximately every fifteen years, at the end of the option period, the State will have a grain elevator which will be worth far more than the State's investment. In addition, the grain elevator has thus far contributed an estimated $16 million to the State's economy. Legislative Audit Council, *A Review of the South Carolina Ports Authority's Grain Elevator at Charleston* (May 4, 1982).

In considering the assertion that the Association is making a profit, we find the Association does indeed have retained earnings, but these earnings are necessary to keep the operation going. This money is used as working capital and for equipment, improvements and accrued taxes, with any excess being refunded to the customers. Furthermore, merely because an individual or private corporation makes a profit as a result of legislation does not change the public purpose into a private purpose. *Anderson v. Baehr*, 265 S. C. 153, 217 S. E. (2d) 43 (1975).

We conclude the operation of the grain elevator is primarily for the benefit of the State and the farmers.

Thus, the argument that Act No. 1272 of 1970 is unconstitutional because it pledges the credit of the State primarily for the benefit of a private corporation must fail.

The Attorney General argues that if Act No. 1272 is constitutional, the agreement must be declared void because it is not in the best interest of the State. We disagree.

The Authority is satisfied with the agreement and the operation of the grain elevator. The farmers are getting higher prices for their soybeans, and the State's overall economy is benefitting by the operation of this grain export facility. This argument must also fail.

We hold the Management Agreement is a legal, valid, and binding contract which does not violate the South Carolina Constitution or Act No. 821 of 1956, as amended.

LEWIS, C. J., and LITTLEJOHN, NESS and HARWELL, JJ., concur.