22248

Alex T. CARLL, Appellant, v. SOUTH CAROLINA JOBS-ECONOMIC DEVELOPMENT AUTHORITY, Respondent.

(327 S. E. (2d) 331)

Supreme Court

*Rhett P. Dove, III,* of *Nelson, Mullins, Grier & Scarborough,* Columbia, *for appellant.*

*Atty. Gen. Travis Medlock, Chief Deputy Atty. Gen. Joseph A. Wilson, II, Asst. Atty. Gen. Charles W. Gambrell, Jr.;* and *O. Wayne Corley, April C. Lucas* and *Peter L. Murphy,* all of *McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble,* Columbia, *for respondent.*

Heard Dec. 10, 1984.

Decided Feb. 26, 1985.

CHANDLER, Justice:

Appellant challenges the constitutionality of Act No. 145 of 1983 (Act), codified as S. C. Code Ann. §§ 41-43-10, *et seq.* (1976 & Supp. 1983).

The Act created the Jobs-Economic Development Authority (Authority) and authorizes programs which provide affordable capital and management assistance to eligible South Carolina businesses.

Appellant bases his challenge upon six grounds, contending that the Act: (I) relates to several subjects in violation of Article III, § 17, S. C. Const. (1895); (II) is not for a public purpose; (III) pledges the credit of the State in violation of Article X, § 11, S. C. Const. (1895); (IV) denies equal protection; (V) delegates governmental power in violation of Article III, § 1, S. C. Const. (1895); and (VI) interferes with interstate and foreign commerce.

We affirm.

The Order of Circuit Judge Walter T. Cox, Jr. properly disposes of all the issues and, as modified, is adopted.

## ORDER OF CIRCUIT JUDGE WALTER T. COX, JR. DATED APRIL 27, 1984, AS MODIFIED

### I. THE ACT RELATES TO SEVERAL SUBJECTS

Article III, § 17 of the South Carolina Constitution provides that "every act or resolution, having the force of law,

shall relate to but one subject, and that shall be expressed in the title." Appellant contends several provisions of the Act are not mentioned in the title, which reads as follows:

"An Act to Create the South Carolina Jobs-Economic Development Authority and To Provide for Its Duties."

The three objectives of the constitutional provision requiring that each act relate to one subject are to (1) apprise the members of the General Assembly of the contents of an act by reading the title, (2) prevent legislative log-rolling and (3) inform the people of the State of the matters with which the General Assembly concerns itself. *DeLoach v. Scheper*, 188 S. C. 21, 198 S. E. 409 (1938); *Arthur v. Johnston*, 185 S. C. 324, 194 S. E. 151 (1937); *Southern Power Company v. Walker*, 89 S. C. 84, 71 S. E. 356 (1911). The title of the Act fulfills those objectives. A title meets the requirements of Article III, § 17 when it states the general subject of the legislation and the provision of the Act are germane to that subject; the title need not be an index to every provision of the act. *Hercules, Inc. v. South Carolina Tax Commission*, 274 S. C. 137, 262 S. E. (2d) 45, 47 (1980). The basic thrust of the Act is to promote economic development in the State through programs administered by a central state agency. The title refers to both economic development and creation of a state agency, thus fulfilling the requirement as to statement of general subject matter. As to whether the Act's provisions are germane to those subjects, Appellant has failed to identify a single provision which is not pertinent to the objectives in the title.

## II. THE ACT IS NOT FOR A PUBLIC PURPOSE

In *Bauer v. South Carolina State Housing Authority*, 271 S. C. 219, 246 S. E. (2d) 869 (1978), we defined the public purpose doctrine as follows:

'All legislative action must serve a public rather than a private purpose,' [*Elliott v. McNair*], 250 S. C. [75] at 86, 156 S. E. (2d) [421] at 427 [1967]. 'In general, a public purpose has for its objective the promotion of the public health, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a

given political division....' *Caldwell v. McMillan,* 224 S. C. 150, 77 S. E. (2d) 798, 801 (1953).... It is a fluid concept which changes with time, place, population, economy and countless other circumstances. *Id.* It is a reflection of the changing needs of society.

271 S. C. at 227, 246 S. E. (2d) at 873.

In deciding whether governmental action satisfies a public purpose, we look to the object sought to be accomplished. If a legislative act is designed to achieve a public goal, satisfy a public need, or solve a public problem, the method chosen by the legislative body will not invalidate the act. *Bauer,* 271 S. C. at 230-231, 246 S. E. (2d) 869. The legislative determination as to what constitutes a public purpose or public need is entitled to great weight.

In *Elliott v. McNair,* we recognized that economic development and creation of jobs were, as a general proposition, matters of public concern. Thus, the question before the Court is whether the provisions of the Act are reasonably related to its legitimate public goals. The findings of the legislature are critical to resolution of the public purpose issue. Here, the legislature's findings are detailed and comprehensive. They indicate the General Assembly undertook a thorough investigation of the employment-development problems faced by this State, determined the problems were severe enough to warrant legislative intervention and made a reasoned judgment as to the appropriate remedies.

The factual record clearly supports the findings of the General Assembly. In light of the record, the legislative findings and the holdings in *Bauer* and *Elliott v. McNair,* we find the Act is for a public purpose.

## III. THE ACT PLEDGES THE CREDIT OF THE STATE

Appellant argues that because the Act authorizes the Authority to pledge its assets, including all real and personal property, the credit of the State is thereby pledged in violation of the Constitution. Similar legislation was upheld in *Bauer, supra.*

The limitation imposed upon the power of the General Assembly by Article X, § 11 of the South Carolina Constitution "relates solely to general obligation

bonds payable from the proceeds of *ad valorem* tax levies."
*Elliott v. McNair*, 250 S. C. 75, 85, 156 S. E. (2d) 421 (1967).
Not only is there no pledging of the proceeds of *ad valorem*
tax levies here, there is also this disclaimer in Section 12 of
the Act:

> In making such agreements the authority does not have
> the power to obligate itself except with respect to pro-
> gram funds and cannot incur a pecuniary liability or a
> charge upon the general credit of the authority or of the
> State or against the taxing powers of the State.

This disclaimer is sufficient to protect the State from pecuni-
ary obligations. *Bauer, supra.*

In *Elliott v. McNair*, we discussed the purpose behind the
constitutional limitation: ". . . the word 'credit' . . . was
intended to protect the state from pecuniary liability. . . ."
*Elliott v. McNair*, 250 S. C. 75, 86, 156 S. E. (2d) 421 (1967).
The Act in no way imposes any pecuniary liability on the
State. Appellant speculates that if the Authority defaults on
its bonds, the State may choose to pay off the bonds.

The purpose of the constitutional limitation is to pre-
vent the State from being *obligated* to use State tax
revenues to pay off the bonds. *Elliott v. McNair, supra;*
*Bauer v. South Carolina State Housing Authority, supra;* and
*State ex rel. Medlock v. South Carolina Family Farm Devel-*
*opment Authority*, 279 S. C. 316, 306 S. E. (2d) 605, 609 (1983).

Appellant argues there is a comingling of funds which
allows state monies to be reached through tracing.
However, Sections 12, 22 and 23 of the Act prohibit
comingling and the type of tracing about which the Ap-
pellant is concerned. There is no mechanism in the Act that
would result in assets of Authority being transferred to
private parties. If the Authority uses program funds to pay
administrative expenses, the program funds cannot be re-
plenished by administrative funds. Once program funds are
used to pay administrative expenses those funds become *de*
*facto* administrative funds. There is, therefore, no comin-
gling. Additionally, the last sentence of Section 22 specifi-
cally prohibits comingling administrative funds with pro-
gram funds. Section 23 mandates that all obligations other
than administrative obligations be paid solely out of pro-

gram funds and that such limitation be "clearly stated on the face of any bonds and in the text of any other obligation or contract."

For these reasons, we find the Act does not permit an unconstitutional lending or pledging of the State's credit.

## IV. THE ACT DENIES EQUAL PROTECTION

The provisions in the Act which place restrictions on the businesses which participate in the Authority's programs are constitutional under state and federal guarantees of equal protection because the classifications drawn are reasonable, are rationally related to the purpose of the Act, and are not drawn upon any inherently suspect distinctions. Although Appellant's arguments address the current regulations adopted by the Authority, those regulations are not before the Court. Only the Act is challenged in the complaint.

A statute may be limited to a particular class, provided the limitation established is for a proper public purpose. *Ex Parte Hollman,* 79 S. C. 9, 60 S. E. 19 (1908); *Simmons v. Western Union Telegraph Co.,* 63 S. C. 425, 41 S. E. 521 (1920). Although the classification may not be arbitrary, and there must be a reasonable relationship between the classification and a proper legislative purpose, *United States Fidelity and Guaranty Co. v. City of Newberry,* 257 S. C. 433, 186 S. E. (2d) 239 (1972), a classification will be sustained against constitutional attack if there is "any reasonable hypothesis" to support it. *Elliott v. Sligh,* 233 S. C. 161, 165, 103 S. E. (2d) 923 (1958). We summarized the controlling principles as follows:

> The requirements of equal protection are satisfied if (1) the classification bears a reasonable relation to the legislative purpose sought to be effected; (2) the members of the class are treated alike under similar circumstances and conditions; and (3) the classification rests on some reasonable basis.

*State ex rel. Medlock v. S. C. Family Farm Development Authority,* 279 S. C. 316, 321, 306 S. E. (2d) 605 (1983).

The determination of whether a classification is reasonable is initially one for the legislature and will not be set aside by the courts unless plainly arbitrary.

*State ex rel. Medlock v. S. C. Family Farm Development Authority, supra; State v. Solomon,* 245 S. C. 550, 141 S. E. (2d) 818 (1965).

The legislature found that lack of capital resources has prevented businesses from locating and expanding within the State, resulting in a threat to the health and welfare of its residents. The classifications in Section 16 of the Act (businesses which can show assistance under the Act will create jobs in the State) are designed to provide those classes of business a means of acquiring needed capital resources while ensuring the benefits derived by these businesses will also flow to the citizens through a decrease in the level of unemployment. The classifications as drawn certainly are reasonable, bear a clear rational relationship to the purpose of the Act and are therefore constitutional.

## V. THE ACT DELEGATES GOVERNMENTAL POWER

The Act does not violate the state constitutional prohibition against delegation of legislative power. Section 9 of the Act allows for delegation of authority from the Authority to any governmental agency or financial institution. Section 17 provides some of the guidelines for delegating to lending institutions. This delegation is within constitutional ambits under Article III, § 1 of our Constitution.

The delegation provided for in Section 9 is almost identical to that in the *Family Farm* statute. The Family Farm general delegation provision reads:

> In the performance of its duties, implementation of its powers and the selection of specific programs and mortgage loans, secured loans or loans to mortgage lenders to receive its assistance, the authority:
>
> \*   \*  ·\*   \*   \*   \*.
>
> 2. Shall exercise diligence and care in selection of mortgage loans, secured loans or loans to mortgage lenders to receive its assistance and shall apply customary and acceptable business and lending standards in the selection and subsequent implementation of the programs authorized by this chapter. *The authority may delegate the necessary authority for the implementation*

*of the programs authorized to any governmental agency, mortgage lender or other financial institution. The authority shall retain ultimate responsibility and provide proper oversight to such implementation.* [Emphasis added].

S. C. Code § 46-47-60 (1976 & Supp. 1983). Section 9 of the Act reads:

The authority must implement the programs of this act as soon as practicable. The authority must exercise care in the performance of its duties and the selection of specific programs and business enterprises to receive its assistance. *The authority may delegate its authority to implement the programs authorized to any governmental agency or financial institution. The authority must retain ultimate responsibility and provide proper oversight for the implementation.* [Emphasis added].

According to the provisions of the Act the Authority may delegate the implementation of the loan programs to lending institutions, but retains ultimate responsibility for the programs through regulations and contractual agreements with the institutions, and the Authority must provide proper oversight for implementation of the programs. Each loan made by the lending institution must be to someone in the beneficiary class and must comply with all of the Authority's regulations. Further, the lending institution must submit evidence satisfactory to the Authority that all loans satisfy the conditions and regulations of the Authority.

A careful review of these provisions shows the Authority maintains final control over the implementation and management of loan programs. Given the Authority's control over and involvement in the implementation of these programs, the Authority's power to delegate ministerial responsibility by contract pursuant to the Act and the Authority's regulations constitutes a constitutionally permissible delegation.

## VI. THE ACT INTERFERES WITH INTERSTATE AND FOREIGN COMMERCE

The Commerce Clause gives the federal government power to regulate interstate and foreign commerce, and states cannot pass regulations which unduly bur-

den the free flow of commerce between the states or with a foreign country. *McCaw v. Fase,* 216 F. (2d) 700 (9th Cir. 1954), *cert. denied,* 348 U. S. 927, 75 S. Ct. 340, 99 L. Ed. 726. The Commerce Clause does not prohibit implementation of any portion of this Act because South Carolina is a market participant and is entitled to establish guidelines for its participation regardless of the effect on interstate or foreign commerce.

Section 20 of the Act provides for development of programs to foster exportation of goods, services, commodities, machinery, equipment or other personal property which has had value added within the State. The Authority is given the power to use any program funds to provide loans, guarantees, insurance or make other commitments to aid eligible exporters. In addition to the "value added" requirement, the Act sets out certain conditions which must be met by the exporter and the foreign purchaser prior to a grant of assistance, including compliance with applicable state, federal and foreign laws.

These conditions may favor South Carolina products over out-of-state products; however, if a state enters a market in competition with other market participants, the Commerce Clause does not limit that state's ability to operate as freely within the market place as other participants. *Reeves v. Stake,* 447 U. S. 429, 100 S. Ct. 2271, 65 L. Ed. (2d) 244 (1980). This freedom includes the right to favor that state's own citizens over others. *Hughes v. Alexandria Scrap Corp.,* 426 U. S. 794, 96 S. Ct. 2488, 49 L. Ed. (2d) 220 (1976).

As a participant in the loan market, the State is free to decide with whom to deal. The State is not preventing local exporters from dealing with out of state or foreign traders; it is establishing guidelines to ensure that maximum benefit to the State is derived from program funds contributed by the State. This is nothing more than every participant in the loan market does on a regular basis. *White v. Massachusetts Council of Construction Employers, Inc.,* 460 U. S. 204, 103 S. Ct. 1042, 75 L. Ed. (2d) 1 (1983), *Fidelity Guarantee Mortgage Corp. v. Connecticut Housing Finance Authority,* 532 F. Supp. 81 (D. Conn. 1982).

The Act was passed to foster growth in the State's business community and thereby alleviate unemployment. The Au-

thority is empowered to issue bonds and make low interest loans to businesses in an effort to lure new business to South Carolina, assist economic development in distressed areas, and develop the State's export trade. Just as the Housing Authority in *Fidelity Guarantee* was entitled to promulgate rules under which it would participate in the market, the Authority is entitled to promulgate and abide by rules designed to govern its participation in the market. The fact that those rules may impact to a degree on interstate and foreign commerce is irrelevant because in this case the Commerce Clause clearly does not apply.

Further, the Act does not constitute an unlawful interference with the exclusive foreign policy making powers of the federal government, or a violation of the Supremacy Clause of the United States Constitution, Article 6, Clause 2. As a market participant, the State has the same rights as all other market participants. A trader may buy from whom he pleases, sell to whom he pleases and, conversely, refuse to do so for reasons sufficient to himself. *Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co.*, 227 F. 46 (2nd Cir. 1915). The conditions for participation in the exporter loan program set out in Section 20 of the act simply provide for the State's exercise of this right. By requiring that the foreign buyer or country of destination be acceptable to the Authority, the State is ensuring it will be able to choose the parties with whom it will deal. This in no way usurps power the State cannot constitutionally exercise.

Affirmed.

LITTLEJOHN, C. J., and NESS, GREGORY and HARWELL, JJ., concur.