22632

Richard S. NICHOLS, individually and on behalf of all others similarly situated, Respondent v. The SOUTH CAROLINA RESEARCH AU-THORITY and Robert E. Henderson, as Director of the South Carolina Research Authority, Appellants.

(351 S. E. (2d) 155)

Supreme Court

*Stephen G. Morrison, George B. Wolfe* and *Arthur L. Coleman,* all of *Nelson, Mullins, Grier & Scarborough,* Columbia, *for appellants.*

*Charlton deSaussure, Jr.,* of *Sinkler, Gibbs & Simons,* Columbia, *for respondent.*

*Atty. Gen. T. Travis Medlock, Chief Deputy Atty. Gen. Joseph Wilson, II,* and *Sr. Asst. Atty. Gen. Kenneth P. Woodington,* Columbia, *for S. C. Coordinating Council for Economic Development, amicus curiae.*

Heard March 25, 1986.

Decided Nov. 17, 1986.

CHANDLER, Justice:

Richard S. Nichols (Nichols), a South Carolina citizen and taxpayer, brought this class action for declaratory and injunctive relief to determine the constitutionality of Act No.

50 of 1983, as amended by Acts Nos. 308 and 309 of 1984 (the Act). *See* S. C. Code Ann. § 13-17-10 *et seq.* (Supp. 1985). The Circuit Court held several provisions of the Act to be unconstitutional, and certain actions contemplated by the South Carolina Research Authority (the Authority) to be *ultra vires.* We affirm in part and reverse in part.

Additionally, we overrule so much of *Byrd v. County of Florence*, 281 S. C. 402, 315 S. E. (2d) 804 (1984), as holds that industrial development is not a public purpose for which public revenues may be appropriated and expended.

## BACKGROUND

The Act creates the Authority in order "to promote the development of high technology industries and research facilities in South Carolina" and "to enhance the research capabilities of [South Carolina's] public and private universities." S. C. Code Ann. § 13-17-20 (Supp. 1985).

The Authority's primary function is to construct and thereafter to operate three research parks. The State Budget and Control Board transferred some 1,500 acres of real property to the Authority for this purpose. Additionally, the Authority is empowered to borrow money and to issue revenue bonds to finance its activities. *See* S. C. Code Ann. § 13-17-70(8) (Supp. 1985).

The Authority has stipulated it intends to pledge the 1,500 acres to secure obligations of private firms which locate in its industrial parks. It plans to offer real estate for sale at less than full market value in order to attract new industries. The Authority also contemplates entering into joint ventures with certain industries.

The Authority contends the Circuit Court erred in holding that its proposed activities would contravene certain constitutional and statutory provisions. It argues these provisions are inapplicable because it is not an agency of the State.

## ISSUES

The Authority's appeal presents five issues:

(1) Whether the Authority is an agency of the State;

(2) Whether the mortgaging of the Authority's 1,500 acres would constitute a pledge of the State's credit;

(3) Whether the Authority may enter into joint ventures with private firms;

(4) Whether the Authority may transfer its property for less than full market value; and

(5)Whether a provision of the Act giving the Authority an election to comply with the Advanced Refunding Act is unconstitutional as special legislation.

In addition, we granted the Authority permission to argue against the precedent of *Byrd, supra.* Accordingly, as a sixth issue we determine:

(6) The precedent of *Byrd.*

## I. STATE AGENCY

The threshold inquiry is whether the Authority is an agency of the State. The parties agree that if the Authority is held not to be a State agency, certain of the remaining issues are mooted because various alleged constitutional and statutory proscriptions would be inapplicable.

The Circuit Court held the Authority to be a State agency, reasoning as follows:

(1) The Act itself recites that the Authority is a "corporation owned completely by the people of the state." S. C. Code Ann. § 13-17-90 (Supp. 1985).

(2) The Authority is empowered to issue revenue bonds under the Advanced Refunding Act, S. C. Code Ann. § 11-21-10 *et seq.* (1976), which is applicable to public agencies.

(3) Public agencies include the State of South Carolina, its agencies and institutions and every other agency or political entity of the State authorized to issue general obligation or revenue bonds. S. C. Code Ann. § 11-21-10(5) (Supp. 1985).

(4) In 1984, the Act was amended to exempt the Authority from various general law provisions applicable to State agencies and employees. *See* S. C. Code Ann. § 13-17-170 (Supp. 1985). If the Authority were not an agency, such legislation would have been unnecessary.

We agree with the reasoning cited above and hold the Authority to be an agency of the State.

## II. PLEDGE OF STATE'S CREDIT
Under the Act, the Authority is empowered:

... [T]o secure the payment of the obligations or any part by mortgage, lien, pledge, or deed of trust, on all or any of its property ... S. C. Code Ann. § 13-17-70(8) (Supp. 1985).

To mortgage, pledge, hypothecate, or otherwise encumber the property, real, personal, or mixed, or notes, bonds, evidences of indebtedness, or other obligations of the authority; *provided the authority shall have no authority to pledge the credit and the taxing power of the State* or any of its political subdivisions ... [Emphasis supplied]. S. C. Code Ann. § 13-17-70(12) (Supp. 1985).

The Authority has stipulated it "intends in some instances to pledge its assets through mortgage or other encumbrance of its property to secure the obligations of high technology industries which locate in its research parks."

The issue here, stated simply, is whether the Authority may mortgage the 1,500 acres of real property transferred to it by the State Budget and Control Board. The Circuit Court held such a mortgage would violate the above-emphasized proviso of § 13-17-70(12) which proscribes the pledging of the State's credit. We disagree.

The Authority concedes it is proscribed from pledging the State's credit, but contends a mortgage of the 1,500 acres would not do so. We agree.

Nichols relies upon two decisions of this Court for his contention that the mortgaging of the Authority's 1,500 acres constitutes a pledge of the State's credit. His reliance is misplaced.

The first, *Casey v. South Carolina Housing Authority*, 264 S. C. 303, 215 S. E. (2d) 184 (1975), involved Act 1171 of the 974 General Assembly, which created a $10,000,000 Guaranty Fund to service bonds issued for low cost housing.

Section 14 of Act 1171 required (1) that the Authority report to the Budget and Control Board "the sum, if any, *required to restore* the Guaranty Fund to the Guaranty Fund Requirement prescribed in Section 7"; (2) that, in turn, the Budget and Control Board report annually to the General Assembly "the amount *necessary to fund* such deficit";

(3) that, "[a]ll sums *appropriated* by the General Assembly for such *restoration* shall be deposited in the Guaranty Fund." [Emphases supplied].

It is patent that § 14, by its provisions which required the *raising of revenue to restore funds* necessary to eliminate deficits in the Guaranty Fund, did pledge the State's credit.

> Accordingly, we held in *Casey:*
> We are of the opinion that the Act commits the State of South Carolina and, by so doing, pledges its credit to make good any deficit arising because of default under both the Direct Mortgage Loan Program and the Mortgage Purchase Program.

The infirmity in *Casey* which struck down Act 1171 is absent here. We agree with the Authority that the 1,500 acres represent a known, quantifiable asset imposing no potential taxpayer liability, now or in the future. Clearly, the holding in *Casey* does not apply here.

Next, Nichols cites *Clarke v. South Carolina Public Service Authority,* 177 S. C. 427, 181 S. E. 481 (1935). In *Clarke* the constitutionality of Act 887 of the 1934 General Assembly was challenged. Under the Act "[t]he Authority was likewise authorized, without in any way pledging the faith, credit and taxing power of the State, to finance the construction of said project by borrowing money to be evidenced by bonds secured by a foreclosable mortgage on the project."

After holding the Act constitutional the opinion in *Clarke* contains dicta in which reference is made to decisions of other jurisdictions forbidding the mortgaging of public property under certain circumstances. However, the opinion also cites with approval other such decisions which specifically hold that the mortgaging of public property, *when authorized by legislative Act,* does not constitute a pledging of the State's credit. *See Hughes v. State Board of Health,* 260 Ky. 228, 84 S. W. (2d) 52 (1935); *Brockenbrough v. Board of Water Com'rs.,* 134 N. C. 1, 46 S. E. 28 (1903); *Haesloop v. City Council of Charleston,* 123 S. C. 272, 115 S. E. 596 (1923), in which an ordinance donating city owned land to a private developer for erection of a tourist hotel was held valid as a public purpose.

Accordingly, we hold that the mortgaging of the 1,500 acres by the Authority does not constitute a pledging of the State's credit.

## III. JOINT VENTURES

The Authority has stipulated it intends to engage in ■ joint ventures by receiving "... some degree of ownership in ... high technology firms." The Circuit Court held the Act gives the Authority no express or implied powers to enter into joint ventures with private businesses. Moreover, the Court held such undertakings would violate S. C. Const. art. X, § 11:

> ... Neither the State nor any of its political subdivisions shall become a joint owner of or stockholder in any company, association, or corporation.

The Authority contends this provision is inapplicable because it is not an agency of the State. As discussed above, we hold the Authority is a State agency.

The constitution clearly prohibits public agencies, such as the Authority, from engaging in joint ownership with private parties. We agree with the Circuit Court and hold the Authority may not enter into joint ventures with private firms.

## IV. TRANSFERS OF PROPERTY FOR LESS THAN FULL MARKET VALUE

The Act empowers the Authority:

> ■ acquire, purchase, hold, use, improve, lease, mortgage, sell, transfer, and dispose of any property, real, personal, or mixed, or any interest therein. S. C. Code Ann. § 13-17-70(5) (Supp. 1985).

S. C. Const. art. III, § 31, provides:

> Lands belonging to or under the control of the State shall never be donated, directly or indirectly, to private corporations or private individuals, or to railroad companies. Nor shall any land be sold to corporations, or associations, for a less price than that for which it can be sold to individuals.

The Circuit Court held § 13-17-70(5) must be read as "prohibiting the donation of property within the meaning of S. C. Const. art III, § 31."

The Authority contends this holding will prevent it from transferring property to private firms for less than full market value. We disagree.

This Court consistently has construed S. C. Const. art III, § 31, to allow the State to consider *indirect benefits* accruing to it in determining whether a grant of State property amounts to a proscribed donation. *See, e.g., State v. Broad River Power Co.*, 177 S. C. 240, 181 S. E. 41 (1935); *Antonakas v. Anderson Chamber of Commerce*, 130 S. C. 215, 126 S. E. 35 (1924).

In *McKinney v. City of Greenville*, 262 S. C. 227, 203 S. E. (2d) 680 (1974), we stated: "It is established beyond question by the decisions of the Supreme Court of South Carolina that a public body may properly consider indirect benefits resulting to the public in determining what is a *fair and reasonable* return for disposition of properties without running afoul of the constitutional prohibition against donations." [Emphasis supplied]. 262 S. C. at 242-243, 203 S. E. (2d) at 688. *See also Elliott v. McNair*, 250 S. C. 75, 156 S. E. (2d) 421 (1967) (no requirement that maximum price be obtained).

The Circuit Court, by clear implication, held that § 13-17-70(5) must be read consistently with S. C. Const. art. III, § 31, *as construed by this Court.* Accordingly, we hold the Authority's exception is without merit.

## V. SPECIAL LEGISLATION

As part of the Act, § 13-17-70(8) provides in part:

... [I]n the exercise of the powers herein granted to issue advanced refunding notes, bonds, or other evidences of indebtedness the authority, may, but shall not be required to, avail itself of or comply with any of the provisions of Sections 11-21-10 to 11-21-80 (Advanced Refunding Act).

The Circuit Court held this provision, giving the Authority an election to comply with the Advanced Refunding Act, constitutes special legislation prohibited by S. C. Const. art. III, § 34(IX). We agree.

The Advanced Refunding Act was enacted to provide a prescribed means by which *all* public agencies may refund outstanding bonds. There is no rational distinction between the Authority's power regarding advanced refunding of outstanding bonded debt and the power of every other public body which may incur bonded debt.

Accordingly, we hold § 13-7-70(8), to the extent it excepts the Authority from the provisions of the Advanced Refunding Act, violates S. C. Const. art III, § 34(IX), by enacting a special law where a general law can be made applicable.

## VI. PRECEDENT OF BYRD v. COUNTY OF FLORENCE

The Circuit Court based its invalidation of Act 50, in part, upon *Byrd, supra.* We granted the Authority's petition to argue against the precedent of that decision.

The majority opinion in *Byrd* (Byrd majority), in a divided 3-2 Court, held invalid Florence County Ordinance No. 14-82-83 (Ordinance 14-82-83) providing for the issuance of general obligation bonds. The bond moneys were to foster development of high technology industries through the construction of a development park. Ordinance 14-82-83 permitted County Council "to borrow $5,500,000 by way of general obligation bonds to be repaid over a period of years from proceeds derived from *ad valorem* taxes imposed on Florence County property owners." The proceeds were to be used to purchase acreage to be improved and offered for sale to private parties for industrial use.

The effect of *Byrd* is to nullify at state, county and municipal levels any legislation which authorizes the expenditure of public funds for industrial development. In short, *Byrd* holds that industrial development does not pass constitutional muster as a "public purpose," within the meaning of S. C. Const. art X, § 14(4).

Our reconsideration of the precedent in *Byrd* involves (1) the scope of judicial review of legislative statutes, (2) a definition of public purpose, (3) the determination of public purpose, and (4) a review of the trial court record in *Byrd.*

### A. SCOPE OF JUDICIAL REVIEW

Where legislative statutes are challenged for constitutionality, the scope of judicial review is prescribed and limited.

"It is an axiom in American jurisprudence that a statute is not to be pronounced void on this ground, unless the repugnancy to the constitution is clear and the conclusion that it exists inevitable.... The judicial function involving such result is one of delicacy and to be exercised always with caution. *Township v. Talcott*, 19 Wall. 673 [22 L. Ed. 227 (1873)]." *Pelzer, Rodgers and Co. v. Campbell and Company*, 15 S. C. 581, 583 (1880).

Every legislative act must be presumed constitutional and should be declared unconstitutional only when its invalidity is manifest beyond a reasonable doubt. *Poulnot v. Cantwell*, 129 S. C. 171, 176, 123 S. E. 651, 653 (1924), citing *Battle v. Willcox*, 128 S. C. 500, 122 S. E. 516 (1924).

"[T]he Constitution of the State is a restraint of power, and the Legislature may enact any law not prohibited thereby." *Fripp v. Coburn*, 101 S. C. 312, 85 S. E. 774 (1914).

Deference to the presumption of constitutionality of legislative acts has been long recognized by this Court. It was eloquently expressed by Chancellor Thomas Waties, writing for the Court in *Byrne's Adm'rs v. Stewart's Adm'rs*, 3 S. C. Eq. (3 Des.) 466, 476-477 (1812):

> This confidence in the wisdom and integrity of the legislature, is necessary to ensure a due obedience to its authority; for if this is frequently questioned, it must tend to diminish that reverence for the laws which is essential to the public safety and happiness. I am not, therefore, disposed to examine with scrupulous exactness the validity of a law. It would be unwise to do so on another account. The interference of the judicial power with legislative acts, if frequent or on dubious grounds, might occasion so great a jealousy of this power, and so general a prejudice against it, as to lead to measures which might end in the total overthrow of the independence of the judiciary, and with it this best preservative of the constitution.

*See also* cases collected in West's Decennial Digest, *Constitutional Law*, at Key Nos. 26 and 48.

## B. PUBLIC PURPOSE

Since the early days of the republic, a legal definition of *public purpose* has been the constant subject of judicial commentary in this and all other states.

The term has been variously defined. Courts and legal scholars alike agree that "a public purpose has for its objective the promotion of the public health, morals, general welfare, security, prosperity and contentment of all the inhabitants or residents within a given political division." *See Caldwell v. McMillan*, 224 S. C. 150, 157, 77 S. E. (2d) 798, 801 (1953) (quoting other authority).

Public purpose is "a fluid concept which changes with time, place, population, *economy and countless other circumstances*. It is a reflection of *changing* needs of society." [Emphases supplied]. *Bauer v. S. C. State Housing Authority*, 271 S. C. 219, 227, 246 S. E. (2d) 869, 872 (1978).

This concept of fluidity was earlier approved in *Caldwell, supra*. "[T]he courts also recognize that customs and usages may change so that a purpose which was formerly conceded to be private may now be public; and therefore the novelty of purpose does not render it the less a public purpose." *Caldwell*, 224 S. C. at 158, 77 S. E. (2d) at 801, quoting 73 C. J. S. *Public*, p. 334 (1983).

"Times change. The wants and necessities of the people change ... On the one hand, what could not be deemed a public use a century ago may, because of *changed economic and industrial conditions*, be such today." [Emphasis supplied]. *State ex rel. Warren v. Nusbaum*, 59 Wis. (2d) 391, 208 N. W. (2d) 780, 798 (Wis. 1973).

"The concensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. 37 Am. Jur., Municipal Corporations, Sec. 132. It reaches perhaps its broadest extent under the view that *economic welfare* is one of the main concerns of the city, state and the federal governments." [Emphasis supplied]. *State ex rel. Jardon v. Industrial Development Authority of Jasper County*, 570 S. W. (2d) 666 (Mo. 1978).

The views we express here reflect the decisions of multiple other jurisdictions which recognize industrial development as a public purpose. *See Lerch v. Maryland Port Authority*,

240 Md. 438, 214 A. (2d) 761 (1965); *City of Frostburg v. Jenkins*, 215 Md. 9, 136 A. (2d) 852 (1957); *State ex rel. Warren v. Nusbaum, supra; Laughlin v. City of Portland*, 111 Me. 486, 90 A. 318 (1913); *State v. Jardon, supra.*

Finally, legislation may subserve a public purpose ■ even though it (1) benefits some more than others and, (2) results in profit to individuals. "Legislation does not have to benefit all of the people in order to serve a public purpose. At the same time legislation is not for a private purpose merely because some individual makes a profit as a result of the enactment." *Anderson v. Baehr*, 265 S. C. 153, 162, 217 S. E. (2d) 43, 47 (1975).

## C. PUBLIC PURPOSE: A LEGISLATIVE DETERMINATION

It is uniformly held by courts throughout the land that the determination of public purpose is one for the legislative branch. This has been made manifest in a long line of decisions of this Court.

"The question of whether an Act is for a public purpose is primarily one for the Legislature." *Park v. Greenwood County*, 174 S. C. 35, 41, 176 S. E. 870, 872 (1934), citing *Poulnot, supra; See also McNulty v. Owens*, 188 S. C. 377, 199 S. E. 425 (1938); *Caldwell, supra; Park, supra; State ex rel. McLeod v. Riley*, 276 S. C. 323, 278 S. E. (2d) 612 (1981); *Elliott v. McNair*, 250 S. C. 75, 156 S. E. (2d) 421 (1967).

Decisions of this Court in which public or corporate purpose has been held to pass constitutional muster involve a wide variety of subjects. *See Haesloop, supra.* (Hotel); *Chapman v. Greenville Chamber of Commerce*, 127 S. C. 173, 120 S. E. 584 (1923) (Office building site); *Battle, supra,* and *Cathcart v. City of Columbia*, 170 S. C. 362, 170 S. E. 435 (1933) (Stadium); *Davis v. Saluda*, 147 S. C. 498, 145 S. E. 412 (1928); *Green v. Rock Hill*, 149 S. C. 234, 147 S. E. 346 (1929), and *Roach v. City of Columbia*, 172 S. C. 478, 174 S. E. 461 (1934) (Waterworks and sewerage); *South Carolina Farm Bureau Marketing Association v. South Carolina Ports Authority*, 278 S. C. 198, 293 S. E. (2d) 854 (1982) (Grain elevators).

## D. THE RECORD IN BYRD

The record in *Byrd* abounds with evidence of economic underdevelopment in Florence County, for which 6,000 unemployed citizens had no job in the work place. The unemployment rate for the Pee Dee area, of which Florence is the pivotal county, greatly exceeded that of the State. A disastrous plummet in Florence's relative per capita income in the State from 9th in 1974 to 19th in 1980 was stark evidence of the need for industrial development. The ability of the County to locate only three new industries over the prior ten years was a devastating statistic. Other evidence in *Byrd* underscored the need for industrial development in Florence County.

Ordinance 14-82-83 was enacted by County Council to address these critical economic conditions.

## BYRD OVERRULED

Throughout our State's history statutes have been challenged on the ground they fail to serve a public purpose as mandated by the constitution. Hotels, water and sewer works, stadiums, slum clearance, low cost housing and grain elevators have been subjects of litigation. *See* cases cited.

Cases decided by this Court in recent years more and more recognize public purpose as a fluid concept, affected by the complexity of modern society. *See Elliott, supra; Hunt v. McNair*, 255 S. C. 71, 177 S. E. (2d) 362 (1970); *Harper v. Schooler*, 258 S. C. 486, 189 S. E. (2d) 284 (1972); *McKinney v. City of Greenville*, 262 S. C. 227, 203 S. E. (2d) 680 (1974); *Gilbert v. Bath*, 267 S. C. 171, 227 S. E. (2d) 177 (1976); *State ex rel. McLeod v. Riley, supra; Johnson v. Piedmont Municipal Power Agency*, 277 S. C. 345, 287 S. E. (2d) 476 (1982); *S. C. Farm Bureau v. Ports Authority, supra; State ex rel. Medlock v. South Carolina State Family Farm Development Authority*, 279 S. C. 316, 306 S. E. (2d) 605 (1983); *Taylor v. Davenport*, 281 S. C. 497, 316 S. E. (2d) 389 (1984); *South Carolina Public Service Authority v. Summers*, 282 S. C. 148, 318 S. E. (2d) 113 (1984); *Wolper v. City Council of the City of Charleston*, 287 S. C. 209, 336 S. E. (2d) 871 (1985); *Bauer, supra.*

While these decisions are not entirely consistent, and none

involved industrial development as the challenged public purpose, they reflect a trend toward broadening the coverage of what constitutes a valid public purpose for the expenditure of public revenues.

This trend is clearly marked in *Bauer v. Housing Authority, supra.* In *Bauer* the late distinguished Justice Rhodes, writing for the Court, rejected the contention that Act 76 of 1977 was invalid because its benefits accrue to *private* individuals. "However, the mere fact that benefits will accrue to private individuals or entities does not destroy public purpose." 271 S. C. at 229, 246 S. E. (2d) at 874.

*Bauer* then quotes from *Warren v. Nusbaum, supra,* for the rationale of its holding:

> [W]hatever benefit is derived by private individuals and specific localities is necessary and incidental to the promotion of public health, safety, education, morals, welfare, and comfort of the people of this state. The advantage to the public of increasing the supply of adequate housing and eliminating the by-products of substandard housing is direct and not indirect or remote.

208 N. W. (2d) at 800.

Finally, the *Bauer* Court cites *McNulty, supra,* in which "this Court sustained an act which provided for farm owners conveying to the public body one acre lots on which rental housing for tenants of low income would be built . . . The fact that provision was made for private ownership did not destroy the public purpose of the act." 271 S. C. at 229, 246 S. E. (2d) at 874.

As pointed out in the vigorous dissenting opinion of now Chief Justice Ness in *Byrd,* funds to be expended under Ordinance 14-82-83 may be equated with General Assembly expenditures for the State Development Board.[1] Other legislative appropriations include millions of dollars to the State Board for Technical and Comprehensive Education to operate special labor-training programs for industries committed to locating in South Carolina.[2] While the direct benefit

---

[1] Act 540, Section 71, Acts and Joint Resolutions, 1986 General Assembly, pursuant to S. C. Code Ann. § 13-3-90 (1976).

[2] *Ibid.,* Section 29, pursuant to S. C. Code Ann. § 59-53-20 (Supp. 1985).

accrues to the private industry, the funds expended stimulate the economy and, in the process, generate revenues for the benefit of the general public. Similarly, funds appropriated for tourism and spent for media advertising by the Department of Parks, Recreation and Tourism[3] are no less valid because they directly benefit certain areas of the State more than others.

It would be anomalous to hold that a government which expends hundreds of millions to alleviate the suffering of its indigent population through multiple social and humanitarian programs,[4] and properly so, is proscribed from providing jobs for the unemployed, who, once employed, contribute tax revenues in support of those very programs.

We hold that *Byrd* is contrary to the principles and authorities set out in this opinion and, specifically, is contrary to the precedent in *Bauer*, which we reaffirm.

Notwithstanding its holding that industrial development falls short of constituting a public purpose, the majority opinion in *Byrd* formulates a four-point standard by which a particular statute for financing industrial development should be tested for constitutionality:

> The Court should *first* determine the ultimate goal or benefit to the public intended by the project. *Second,* the Court should analyze whether public or private parties will be the primary beneficiaries. *Third,* the speculative nature of the project must be considered. *Fourth,* the Court must analyze and balance the probability that the public interest will be ultimately served and to what degree. [Emphasis supplied].

*Byrd,* 281 S. C. at 407, 315 S. E. (2d) at 806. We find this standard to be reasonable and we adopt it here. Otherwise, we overrule *Byrd.*[5]

We expressly hold that industrial development is a valid public purpose, as determined by the legislative body involved in *Byrd.*

---

[3] *Ibid.,* Section 70, pursuant to S. C. Code Ann. § 51-1-75 (Supp. 1985).

[4] *Ibid.,* Sections 33, 34, 40, 41, 42, 43 and 45.

[5] In overruling *Byrd* we recognize, of course, the power of the legislative branch to limit the scope of industrial development statutes. Such a limitation appears in the legislation involved in *this* case, as discussed in Issue II of this opinion.

Accordingly, acts of the General Assembly or its political subdivisions which expend public funds for industrial development are constitutional, PROVIDED they satisfy the four-point standard formulated in *Byrd* and adopted here.

Affirmed in part and reversed in part.

NESS, C. J., and GREGORY, HARWELL and FINNEY, JJ., concur.