535 S.E.2d 631

**WDW PROPERTIES, a South Carolina general partnership, Appellant,**

v.

**CITY OF SUMTER, South Carolina; South Carolina Jobs–Economic Development Authority; and Uptown Synergy, LLC, Respondents.**

**No. 25174.**

Supreme Court of South Carolina.

Heard June 8, 2000.

Decided July 24, 2000.

Thomas E. Player, Jr., of Player & McMillan, LLC, of Sumter, for appellant.

Steve A. Matthews and B. Eric Shytle of Sinkler & Boyd, P.A., of Columbia, for respondents.

WALLER, Justice:

WDW Properties (WDW) brought a declaratory judgment action challenging the legitimacy of a program in which the proceeds of tax-exempt bonds issued by a state agency would be loaned to a developer renovating retail and commercial properties in a blighted area of the city of Sumter (City). A master-in-equity rejected WDW's claims after a bench trial and WDW appeals.[1]

## FACTS

The parties have stipulated to the following facts. The Internal Revenue Code authorizes the use of federally tax-exempt local government bonds that finance business enterprises in designated urban "empowerment zones." *See* 26 U.S.C. §§ 1391–1392 (Supp.1999). The secretary of the United States Department of Housing and Urban Development (HUD), at the request of local government officials, in 1998 declared about 18 square miles located in Richland and Sumter counties as an urban empowerment zone.[2] The governing

---

1. The Court of Appeals transferred this case to us on the parties' motion. *See* S.C.Code Ann. § 14–8–200(b)(4) (Supp.1999) (providing for direct appeals to Supreme Court in cases involving various types of government bonds).

2. An area is eligible for designation as an "empowerment zone" only if it meets criteria that relate to population, economic distress, geographic area, and poverty rates. Such areas are nominated by local governments in a competitive process. Designations are effective for ten years unless revoked earlier by HUD. A commercial, retail, or service business in an empowerment zone qualifies for tax-exempt financing if at least thirty-five percent of its employees live in the empowerment zone, and most of its income and property are generated by or engaged in the

body of City in 1999 declared its downtown to be a "slum and blight area" and designated it as a "redevelopment project area" located in the empowerment zone.

Uptown Synergy plans to develop the Hampton at Main Project, located in the redevelopment project area. The $4.3 million project consists of interior and exterior renovations of three adjoining historic buildings, which would be leased for commercial office and retail space. The project is expected to create twenty full-time jobs, and the developer hopes to target low- and moderate-income persons for employment at the various offices and retail businesses. In its application for financing to the South Carolina Jobs–Economic Development Authority (JEDA), Uptown Synergy stated the project would "serve as the cornerstone for the revitalization of downtown Sumter and the surrounding communities."

JEDA's governing board adopted a resolution in which it pledged to seek authorization from the state Budget and Control Board to issue $2.5 million in economic development revenue bonds that would be exempt from state and federal income taxation. Under loan documents executed in 1999, JEDA would loan the bond proceeds to Uptown Synergy to finance about 58 percent of the project's cost. Uptown Synergy would repay the loan with revenue from the project. No tax money is involved or pledged with regard to the project. However, the tax-exempt nature of the bonds would result in lower interest costs to Uptown Synergy than it would pay if it had to obtain conventional financing.

WDW, a general partnership, owns and leases Liberty Square, which includes mini-warehouse units, retail businesses, and commercial office space. Liberty Square is not located in the empowerment zone and is not eligible for government-sponsored financing. Uptown Synergy's project would compete with Liberty Square for tenants and patrons. The apparent reason for WDW's lawsuit is its belief that government-sponsored financing gives Uptown Synergy an unfair economic advantage in the competition for tenants and patrons.

---

business in the empowerment zone. *See* 26 U.S.C. §§ 1391–1392 (Supp.1999).

*ISSUE*

Did the master err in holding that the JEDA loan program serves a public purpose through the redevelopment of blighted urban areas?

*STANDARD OF REVIEW*

■■■■ When an appeal involves stipulated or undisputed facts, an appellate court is free to review whether the trial court properly applied the law to those facts. *J.K. Constr., Inc. v. Western Carolina Regional Sewer Authority,* 336 S.C. 162, 519 S.E.2d 561 (1999). This Court will not declare a statute or regulation unconstitutional unless its repugnance to the Constitution is clear and beyond a reasonable doubt. *Southeastern Home Bldg. & Refurbishing, Inc. v. Platt,* 283 S.C. 602, 325 S.E.2d 328 (1985); *Pelzer, Rodgers & Co. v. Campbell & Co.,* 15 S.C. 581 (1881).

*DISCUSSION*

■■■■ WDW contends the master erred in ruling that the JEDA loan program at issue in this case serves a public purpose through the redevelopment of blighted urban areas. The master erred by reading *Carll v. South Carolina Jobs–Economic Development Authority,* 284 S.C. 438, 327 S.E.2d 331 (1985), to mean that so long as the issuance of a given series of bonds is authorized by the JEDA Act, then the issuance of such bonds necessarily serves a required public purpose. *Carll* should be interpreted only to hold that the issuance of revenue bonds to finance industrial facilities serves a public purpose, a principle previously established by this Court, WDW argues.

WDW bases its argument on the fact that, when *Carll* was decided in 1985, JEDA regulations prohibited loans to retail or food establishments. Current JEDA regulations allow economic development bond loans to commercial businesses in certain situations, including downtown redevelopment and in economically distressed areas. WDW believes those regulatory changes mean *Carll* is not dispositive.[3]

---

**3.** JEDA regulations were first promulgated in 1984. The regulation at issue initially stated, as it did when *Carll* was decided, that:

WDW urges us to follow the views expressed in *State ex rel. McLeod v. Riley,* 276 S.C. 323, 278 S.E.2d 612 (1981), and *Anderson v. Baehr,* 265 S.C. 153, 217 S.E.2d 43 (1975). In

> A. [JEDA] will make loans only to manufacturing, industrial, or service businesses which:
>> (1) Operate as private "for profit" enterprises; and
>> (2) Have a net worth not exceeding three million dollars; and
>> (3) Have a net profit after taxes averaging 20% or less of net worth for the previous three years.
>
> B. No loans will be made to:
>> (1) Retail establishments
>> (2) Food establishments.

25 S.C.Code Ann.Regs. § 68–10 (Supp.1984).

The regulation was amended in 1985 after *Carll* was decided to provide:

> A. [JEDA] will make loans to manufacturing, industrial, service, and other commercial businesses which:
>> (1) Operate as private "for profit" enterprises.
>
> B. No loans will be made to:
>> (1) Retail establishments except where downtown redevelopment is involved
>> (2) Food establishments.

25 S.C.Code Ann.Regs. § 68–10 (Supp.1985).

The regulation was last amended in 1987 and has since remained unchanged. It presently provides:

> A. [JEDA] will make Community Development Block Grant loans, economic development bond loans, on either a tax-exempt or taxable basis, and loans from any other program funds which become available, to manufacturing, industrial, research, service, commercial and other businesses which:
>> (1) Are located in South Carolina; and
>> (2) Create or maintain jobs in South Carolina.
>
> B. No economic development bond loans or Community Development Block Grant loans will be made to:
>> (1) Commercial establishments, including hotels, shopping malls, office buildings, and mercantile establishments, except where downtown redevelopment is involved or where located in an economically distressed area or where it will result in increased employment; provided, however, that in the case of hotels, loans may also be made regardless of location for projects which will have a higher than usual promotional impact upon the tourism industry in the State; and provided further that, in the case of medical facilities, loans may also be made regardless of location where there has been a showing that the assistance will help relieve a shortage of doctors, specialists or medical services in the area where the project is located.
>> (2) Restaurant establishments except where such establishments are located on the premises of a hotel and for which economic development bonds are being issued.

25A S.C.Code Ann.Regs. § 68–10 (1989).

*McLeod,* this Court considered amendments to the Industrial Revenue Bond Act[4] that allowed the issuance of revenue bonds for the benefit of commercial and retail facilities. The Court also considered a statute allowing the State to issue general obligation bonds to finance an alcohol fuel development program. The Court struck down both the amendments and the statute as unconstitutional, ruling, among other things, that neither primarily served a public purpose.

The *McLeod* Court stated that revenue bonds for retail and commercial businesses would provide only a "remote or indirect public benefit." Such businesses would not alleviate the pervasive problems of lack of industry and employment, would provide a minuscule number of jobs compared to industrial projects, and would merely result either in the relocation of existing businesses or importation of national chains to compete with existing businesses. *McLeod,* 276 S.C. at 332, 278 S.E.2d at 617. Approving the issuance of revenue bonds for retail and commercial businesses would "permit local governments to effectually promote undertakings to compete in free enterprise with other businesses which do not have the advantage which the Act would give." *Id.* at 333, 278 S.E.2d. at 617.

In *Anderson, supra,* the city of Spartanburg intended to issue revenue bonds in order to purchase property in blighted areas (through condemnation if necessary), find an interested developer, and lease or sell the property to the developer in the hope that such payments would cover repayment of the city-issued bonds. The Court held that the act, which it described as allowing the city to "join hands" with unknown private developers, did not serve a public purpose because the benefit to the developer would be substantial, while the benefit to the public would be negligible and speculative. The Court also noted the Legislature had not made any findings of public purpose in the act. *Anderson,* 265 S.C. at 159–63, 217 S.E.2d at 46–47.

In response, City argues that *Carll, supra,* is dispositive. City further asserts that the views expressed in *McLeod* and *Anderson* have been implicitly rejected by later cases in which this Court has taken a broader view of public purpose and exhibited greater deference to the legislative determinations

4. S.C.Code Ann. §§ 4–29–10 to –150 (1986 & Supp.1999).

regarding public purpose. The public purpose doctrine "is an evolving concept that reflects the changing needs of society." Even if *Carll* is not dispositive, the JEDA loan program in this case serves a public purpose, City asserts.

Revenue bonds such as those that JEDA would issue in this case are payable solely from the revenues of the particular project or enterprise, not from taxpayer funds. *See Wolper v. City Council of City of Charleston,* 287 S.C. 209, 214, 336 S.E.2d 871, 874 (1985); *Anderson v. Baehr,* 265 S.C. at 159–60, 217 S.E.2d at 46; *Elliott v. McNair,* 250 S.C. 75, 83, 156 S.E.2d 421, 425 (1967); *Black's Law Dictionary* 1319 (1990). Revenue bond debt, as well as general obligation debt incurred by the government and repaid by government funds, may be incurred only for a public purpose. S.C. Const. art. X, § 13(9); *Elliott,* 250 S.C. at 86, 156 S.E.2d. at 427 (holding that Industrial Revenue Bond Act serves a public purpose as required by state constitution); *Feldman & Co. v. City Council of Charleston,* 23 S.C. 57, 62–63 (1885) (holding that a law authorizing taxation for any purpose other than a public purpose is void).[5]

In *Carll,* we rejected several constitutional challenges to the 1983 act creating JEDA. In discussing whether the Act served a public purpose, we explained that

[a]ll legislative action must serve a public rather than a private purpose. In general, a public purpose has for its objective the promotion of the public health, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a given political division.... It is a fluid concept which changes with time, place, population, economy and countless other circumstances. It is a reflection of the changing needs of society.

---

5. S.C. Const. art. X, § 13(9) provides:

The General Assembly may authorize the State or any of its agencies, authorities or institutions to incur indebtedness for any public purpose payable solely from a revenue-producing project or from a special source, which source does not involve revenues from any tax but may include fees paid for the use of any toll bridge, toll road or tunnel. Such indebtedness may be incurred upon such terms and conditions as the General Assembly may prescribe by law. All indebtedness incurred pursuant to the provisions of this subsection shall contain a statement on the face thereof specifying the sources from which payment is to be made.

*Carll*, 284 S.C. at 442–43, 327 S.E.2d at 334 (citations omitted); *see also* S.C.Code Ann. §§ 41–43–10 to –280 (1986 & Supp. 1999) (codifying South Carolina Jobs–Economic Development Fund Act). We held that the JEDA Act served a public purpose because its provisions were reasonably related to the legitimate public goals of economic development and job creation. We observed the Legislature's findings regarding the State's economic development problems were "detailed and comprehensive." *Id.*

We agree with WDW that *Carll* is not dispositive. *Carll* did not involve any particular bond issue or loan, but was an attack on the facial. validity of the act creating JEDA. More importantly, regulations then in ·existence prohibited JEDA from making government-sponsored loans to retail or commercial businesses. JEDA regulations were amended in 1987 to allow such loans in certain situations. *See* footnote 3. A statutory or regulatory change could transform a previously constitutional loan program into one that violates the public purpose doctrine. Therefore, *Carll* should not be read to foreclose challenges to JEDA programs simply because a given loan does not violate JEDA's statutory or regulatory framework as it exists when the loan is proposed or made.

However, we hold that the JEDA loan program in this case serves a public purpose as required by the constitution. We adhere to the views espoused in *Carll* and *Nichols v. South Carolina Research Authority*, 290 S.C. 415, 351 S.E.2d 155 (1986).

In *Nichols*, we upheld a statute authorizing a state agency to issue revenue bonds in order to provide financial assistance to advanced technology businesses. We overruled *Byrd v. County of Florence*, 281 S.C. 402, 315 S.E.2d 804 (1984), in which we had struck down on public purpose grounds Florence County's proposal to issue general obligation bonds to acquire and develop an industrial park to be used to attract industrial investment. In *Nichols*, we extensively discussed the public purpose doctrine and its inconsistent application in various cases over the years. We explained that

[t]imes change. The wants and necessities of the people change.... On the one hand, what could not be deemed a

public use a century ago may, because of *changed economic and industrial conditions,* be such today.

The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. It reaches perhaps its broadest extent under the view: that *economic welfare* is one of the main concerns of the city, state and the federal governments.

The views we express here reflect the decisions of multiple other jurisdictions which recognize industrial development as a public purpose.

Finally, legislation may subserve a public purpose even though it (1) benefits some more than others and, (2) results in profit to individuals. Legislation does not have to benefit all of the people in order to serve a public purpose. At the same time legislation is not for a private purpose merely because some individual makes a profit as a result of the enactment.

*Nichols,* 290 S.C. at 425–26, 351 S.E.2d at 161 (emphasis in original) (citations and internal quotes omitted).

We emphasized anew that "[i]t is uniformly held by courts throughout the land that the determination of public purpose is one for the legislative branch.... The question of whether an Act is for a public purpose is primarily one for the Legislature." *Id.*

We reached a similar conclusion in *Wolper,* decided the year before *Nichols.* In *Wolper,* we upheld the constitutionality of a statute that allows cities to incur debt to revitalize deteriorating areas, with the debt service to be provided from the increased increments of property tax revenue resulting from the redevelopment project. We concluded that elimination of decaying and unhealthy areas within a city directly benefits the public, although private parties within the area also may benefit incidentally. *Wolper,* 287 S.C. at 216, 336 S.E.2d at 875.

Although we overruled *Byrd, supra,* in *Nichols,* we adopted the four-part test from *Byrd* to use in determining whether the public purpose doctrine is violated. "The Court should *first* determine the ultimate goal or benefit to the public intended by the project. *Second,* the Court should

analyze whether public or private parties will be the primary beneficiaries. *Third,* the speculative nature of the project must be considered. *Fourth,* the Court must analyze and balance the probability that the public interest will be ultimately served and to what degree." *Nichols,* 290 S.C. at 429, 351 S.E.2d at 163 (emphasis in original).

Accordingly, we apply the *Nichols* test in this case. First, the ultimate benefits to the public are to increase the number of available jobs, improve the appearance of rundown buildings in Sumter's downtown, attract new businesses, and reinvigorate a downtown area that has been classified by the local and federal governments as economically distressed. Second—deferring to the Legislature's determination in establishing the JEDA program—the public will be the primary beneficiary, although the developers certainly will benefit from a more favorable loan rate. Third, the project is speculative, as is any redevelopment effort, but it is not so speculative that it violates the public purpose doctrine. And fourth, the public interest is likely to be served to a substantial degree through the creation of jobs, the reinvigoration of the downtown area, and benefits, both tangible and intangible, that should result from that reinvigoration.

■ We conclude that our opinion in *Nichols* implicitly overruled *McLeod's* holding that revenue bonds may not be issued on behalf of retail or commercial businesses. We now take a broader view of the public purpose doctrine and give substantial weight to legislative determinations of the issue.

We find *Anderson, supra,* distinguishable from the present case. The Legislature did not make specific findings regarding the public purpose of the Act at issue in *Anderson,* while the Legislature has made such findings in the JEDA Act. The power of eminent domain was involved in *Anderson,* but not in this case. The city would have played a major role in the revitalization process in *Anderson,* leading the Court to conclude that the "Act undertakes to permit the city to effectually promote business undertakings to compete in free enterprise with other businesses which do not have the advantage which the Act would give. We think it a fair conclusion to say that benefit to the developer or entrepreneur, would be substantial, and the benefit to the public would be negligible and specula-

tive." *Anderson*, 265 S.C. at 163, 217 S.E.2d at 47. In contrast, the role of City and JEDA in this case is more limited in that neither is actively promoting business undertakings to compete in free enterprise with other local businesses.

## CONCLUSION

We affirm the master's ruling that the JEDA loan program serves a public purpose as required by the state constitution. We overrule *McLeod*, 276 S.C. 323, 278 S.E.2d 612, to the extent it conflicts with the views expressed in *Carll, supra, Nichols, supra*, and this opinion. We find *Anderson*, 265 S.C. 153, 217 S.E.2d 43, distinguishable from this case.

**AFFIRMED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.